**TIMBERLANE LUMBER COMPANY, et al., Plaintiffs,**

**v.**

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, et al., Defendants.**

**Nos. C 73–0792 SW, C 74–0275 SW, C 74–0277 SW and C 74–0278 SW.**

United States District Court, N.D. California.

Oct. 24, 1983.

John H. Boone, Arthur L. Martin, Boone, Knudsen & Martin, San Francisco, Cal., William Hillyer, Norman R. Allenby, Hillyer & Irwin, San Diego, Cal., for plaintiffs Timberlane Lumber Co., Gordon Sloan Smith, Jorge Lima and Miguel Ardon.

Pillsbury, Madison & Sutro, William I. Edlund, Walter J. Robinson, III, Charles R. Ragan, John F. Nolan, Terry Calvani, San Francisco, Cal., for defendants.

## ORDER AND MEMORANDUM OF LAW GRANTING DEFENDANTS MOTION

1. Since the parties were sent forward in 1977, armed with a new "test", by which the merits of this Court's jurisdiction would be assessed, the amount of discovery conducted has fleshed out both the allegations of misdeeds on both sides, as well as sufficient material from which this Court can evaluate the comparative interests of the United States and Honduras in this matter.

Needless to say, the assortment and volume of the submitted materials present more than adequate documentation of these interests; sifting through the materials has taken this Court much time and involved much research. *Compare Zenith Radio Corp. v. Matsushita Electric Industrial,* 494 F.Supp. 1161, 1167 (E.D.Pa. 1980), where Judge Becker faced with a similarly acrimonious, and factually complex antitrust suit, addressed many of the same mechanical and substantive problems we were presented with here.

2. Defendants have moved for judgment on alternative grounds of no extraterritorial jurisdic-

TO DISMISS FOR LACK OF JURISDICTION AND FOR *FORUM NON CONVENIENS*, AND DENYING DEFENDANTS MOTIONS FOR JUDGMENT ON PLEADING OR SUMMARY JUDGEMENT

SPENCER WILLIAMS, District Judge.

## ORDER AND MEMORANDUM OF LAW

Upon review of all the submitted testimonial, documentary, and other evidence[1] offered in support of the massive briefing on defendants' motion for summary disposition of plaintiffs' antitrust complaint[2], IT IS HEREBY ORDERED THAT defendants' motion to dismiss for lack of this Court's subject matter jurisdiction is GRANTED. Defendants' motions for judgment, in the alternative, are DENIED. We explain these holdings below.

FACTS:

The first operative facts of this lengthy case occurred in the early 1970's when a small group of United States businessmen attempted a highly leveraged buy-out of a failing Honduran lumber firm. These investors[3] who had previously joined in other timber-related ventures were enticed by E.H. Robbins to consider Honduras lumber as a new opportunity. In 1971, Sloan Smith, as an agent provocateur for Robbins and his associates, discovered the Lima family mill and timber holdings in an outlying area of Tegucigalpa, the capital city of Honduras. Lima et Hijos, S.A.[4] had been

tion, or summary judgment on the merits of plaintiffs' antitrust complaint on June 6, 1981. Further briefing of the various issues immediately relevant to those motions was complete on March 28, 1983.

3. Timberlane Lumber Co., a general partnership with its principal offices in Eugene, Oregon, and other offices in Florida and New York, New York, purchases and wholesales lumber through a network of dealers across the country. Timberlane's principals include both general and limited partners; the exact number and identity of which fluctuated during the course of events with which this Court is concerned. Although the number of financial interested parties has ebbed in recent years, E.H. Robbins ("Robbin") continues to be the managing partner, and will primarily benefit from any recovery.

4. Lima Y Hijos, S. de R.L. ("Lima") was the Honduran limited partnership, through which Timberlane's partners hoped to enter the Hon-

experiencing a liquidity and management crisis; although originally a small family-managed and prosperous mill, a series of misfortunes had dealt the enterprise severe setbacks. After the death of its founder and family patriarch, the family's tenuous control of the business was threatened by financial obligations the firm had assumed with the Bank of America, Banco de Honduras and one Casanova, a creditor and competing mill.

Enter Timberlane and Sloan Smith.

In 1971, Robbins and the other principals of Timberlane Lumber Company formed two Honduran subsidiaries as investment vehicles in the lumber industry.[5] The first of these entities was Danli Industrial, S.I. ("Danli")[6], incorporated in Honduras principally by the Timberlane general partners to acquire lumber contracts in Honduras. A second corporation, Maya Lumber Company, S. de R.L., ("Maya")[7] was held in a Panamanian shell corporation owned by

Smith, and was to obtain the Lima assets, and employ a couple of Lima "hijos" to help continue the milling operations. A third corporation, Pinex, S.A. ("Pinex") was to export lumber from Honduras to designated markets.

Throughout 1968–1971, the Honduran branch of the Bank of America ("Branch"), continued to increase its exposure on loans to the Limas, in apparent disregard for the home office or regional branch credit officers' admonitions to the Branch that the Lima family business did not appear to merit the credit. The Branch continued to make the loans, without imposing the restrictive requirements urged by these regional loan officers or the home office in San Francisco.[8] Despite Lima's failure to maintain the precautions considered by the supervisory personnel as essential in safeguarding the Bank's investment in the firm, the Honduran branch was inexplicably overzealous in extending the troubled firm credit.[9]

duran lumber market. Prior to Timberlane's entry into this market, at least two Honduran companies, Lima and Jose Lamas, S. de R.L. ("Lamas") competed in the milling and distributing of native pine to domestic and some limited foreign markets. Lima operated a sawmill and remilling plant at Tegucigalpa, and jointly owned 50/50%, with Lamas, a nearly identical plant nearby. While partners, this relationship enabled them to control prices paid for the various raw lumber stocks they purchased from small mill owners, and subsequently resold as rough lumber. Lamas later bought Lima out, leaving the two companies in bitter competition for the business that they had formerly shared.

5. Due to diminishing supply of timber in the Northwest, where the Timberlane partners also own and operate milling facilities, Timberlane thought it prudent to seek additional supply of lumber for sale in the U.S. and Canada. It turned to Honduras since, despite an apparent lack of experience or the appearance of comparable development of its industries, the principals were convinced by Smith that it offered an abundant source of commercial quality lumber with cheap labor and transportation costs.

6. Danli was organized in May 1971 to acquire Honduran timber and operate a mill sixty miles from the Honduran capitol of Tegucigalpa. Intermittent land title disputes with the native Indian squatters ("campesinos") on the property Danli planned to log prevented effective operations until December, 1972, and again beginning in March, 1973.

7. Maya was organized as a shell corporation in December, 1971, with $2500 capital for the purpose of taking over and operating a sawmill in Tegucigalpa. With $170,000 funneled to Honduras by Timberlane partners through the Panamanian corporation controlled by Smith, Maya was actually the entity which attempted to acquire the principal assets of Lima, in January, 1972.

8. During the fall of 1970, Francisco Lima negotiated with the Bank of America's Tegucigalpa Branch manager, Nasser Bonheur, to increase his line of credit to $250,000, securing it with a general obligation mortgage. The Bank's branch had served as Lima's principal banker since 1968, when the Bank first extended funds in exchange for a form of security interest, discussed *infra*.

9. Lima became ill shortly after the Bank increased the firm's line of credit in 1970; his sons, chiefly headed by Ricardo, attempted to manage the company in his absence. After receiving additional personal guarantees of certain family members, the Bank granted Lima an additional $200,000 credit for working capital purposes, upon conditions that: (1) the company change from a partnership to a corporation; and (2) the family contribute its personal loan accounts to the capitalized value of the company, thereby increasing the appearance of the company's net worth to over $1 million. However, these additional funds were never made available to the company.

The Bank, through the Branch, had also maintained normal business relationships with other lumber producers in the country; these dealings included the Bank's extension of sizable loans to finance these entities' activities. At the time of Timberlane's investment in Lima, Lima was indebted to the Bank for borrowings approximating U.S. $250,000, secured by a hipoteca de empressa, a security device provided under Honduran law, entitling the Bank to an all-inclusive right of foreclosure against any of Lima's property.

Lima's deteriorating financial condition intensified their creditors' serious qualms about their exposure to loss on the loans in the event of default. Other creditors of Lima felt as did the regional and home office of the Bank: the time to pull the plug on outstanding loans had arrived.[10] A flurry of legal proceedings in Honduras on the outstanding loans to Lima ensued; in an action by Banco de Honduras to foreclose on its loan to Lima, the Bank intervened, pressing its priority against the assets as established by its hipoteca.[11] Also Casanova, a competing firm, intervened in that action on behalf of its claim secured by a pledge of lumber from Lima's yard.[12]

The Bank prevailed upon Lima's other creditors to accede to its claim's priority; however, these creditors' interests, while subordinated, remained undiluted.[13]

In a second suit filed in a Honduran labor court, the workers' union sought to protect the claims of employees to the wages and concessions promised them by Lima during a conciliatory period from June to July, 1971. By failing to satisfy the workers' claims to accrued wages, after the union had voluntarily deferred collection, upon Lima's assurances that it could work itself out of the then-present cash squeeze, Lima became immediately liable for 150% of back wages and severance benefits in July, 1971.

Notwithstanding its intervention in the suit initiated by the Banco de Honduras, the Bank filed a separate foreclosure action on the hipoteca in August, 1971. The Honduran court which heard that suit decreed another embargo, directing that the Lima assets be sold at judicial auction to satisfy the Bank's claim. The judicial sale never occurred, since Lima had surreptitiously disposed of their interest in these assets to the Union and to Timberlane, leaving the Bank's claim to approximately U.S. $180,000 unsatisfied in late 1971.[14]

10. Francisco Lima died in February, 1971, his sons were losing money at the mill, and by May, 1970, the Bank had evaluated its outstanding loan commitment to Lima as "not bankable". The regional office of the Bank, located in Guatemala, instructed the Branch to liquidate the Lima account.

11. On, or about, April 30, 1971, Banco de Honduras, S.A., another creditor of Lima, brought a foreclosure action before the Juzgado Primero de Letras de lo Civil (First Civil Court of Record) in Honduras. That Court issued an "embargo", or court-ordered attachment, on the Lima assets; but, before a public sale of the property could be held to satisfy that claim, the Bank and another creditor, Pedro Casanova y Hijos, S. de R.L., separately intervened in the lawsuit, each claiming priority of security interests, relying respectively upon a hipoteca de empressa, and on a pledge of lumber. The two banks later settled their rival claims, with the Bank taking priority; the Bank and Casanova combined and factored their loans to a third-party agent Caminals, for collection.

12. Casanova, trying to obtain the approximately 800,000 board feet of lumber which it claimed under the terms of its loan, brought two other proceedings: one in the Second Labor Court of

Record, and one in the Second Civil Court of Record.

13. On August 12, 1971, the Bank filed a separate action against Lima in the First Civil Court of Record to foreclose on the hipotec and to enjoin the recording of the attempted conveyance by Lima to the labor union, to settle outstanding wage claims of its workers; *see text at n. 14, infra.* Banco de Honduras and Casanova joined in this action, claiming the conveyance of inventories by the Labor Court to the unions was illegal. The Civil Court upheld the Labor Court on October 22, 1971; on appeal, the Supreme Court ruled that the adjudication of the machinery and equipment had been legal, although Casanova had a prior lien on the lumber inventories.

14. On November 17, 1971, the Syndicate offered the Bank the opportunity to buy the machinery and equipment adjudicated to labor to protect the Bank's first mortgage position. Two days later, Bonheur, after consulting the Bank's San Francisco headquarters, responded that the Bank was not interested and that the Syndicate ought to take whatever course it felt in the best interest of the former workers. In January

In late 1971, Timberlane's principals learned from Smith that Lima's equipment and capital assets might be obtained from the union. Upon advice of counsel that the Syndicate might convey good title to those assets, they agreed to purchase them, and on January 20, 1972, completed the purchase and recorded the transaction in the Public Register for Commerce. Under Smith's management and supervision, Maya resumed Lima's lumber milling and shipping operations.

Smith and Robbins, on Timberlane's behalf, made multiple entreatments to the Bank, both through the Branch's loan officers, as well as through senior management in San Francisco, to relieve the pressure of its hipoteca upon nascent efforts at reviving Lima's operations under their control. Bonheur responded that the Bank had written off the note, and was not interested in rescheduling or refinancing the debt. Although the Bank's officials in San Francisco met with Robbins and counsel to entertain Timberlane's proposals, no formal or written agreement to restructure the Lima obligation, or commitment to reach an agreement was obtained by Timberlane from the Bank or Branch. Throughout this time, Timberlane, via its various corporate incarnations, attempted to mill and market lumber, using these highly leveraged assets. Their business plan seemed quite simple: with only a minimal cash infusion, the partners in Timberlane had sought to obtain the cooperation of Lima's creditors to permit them the chance to turn the enterprise around, and reserve for themselves any "upside" profitability, with little, if any, capital investment at risk. Stripped clean of much conflicting evidence of intent, good faith or conspiracy, this amounts to a very simple attempt by Timberlane's partners to force Lima's creditors, if they refused to consent, to an involuntary leveraged buy-out of the goodwill

and ongoing productive assets of the company.

Meanwhile, the Bank's attorney, Dr. Gutierrez, advised the Bank that Maya's title to the assets was, in his opinion, defective because of the manner in which the sale by the Syndicate had been conducted. However, by April of 1972, the Bank's management, already dismayed by Branch's disregard for its past directives to refrain from increasing the Lima borrowings, reacted to what appeared to be Timberlane and Lima efforts to secrete assets, and opted to liquidate the outstanding Lima indebtedness.

Being a U.S. multinational, the Bank apparently thought it prudent to avoid having itself, or its Branch, appear to side against the Syndicate's assertion of ownership of the assets on the workers' behalf. Therefore, instead of attacking title directly, the Bank chose to transfer its security interest to Casanova, a lower priority creditor. Casanova, in turn, consolidated the Bank's claim with its own, and transferred both claims to Caminals for collection. In final form, the agreement between these Lima creditors provided that anything realized by Caminals, as substituted plaintiff, would be split proportionately among them.

Caminals, as an undisclosed agent for collection of the substantial debts, obtained another embargo against sale or disposal of the Lima assets by Timberlane or the Limas. He then offered Smith a settlement of the entire matter, upon Timberlane's satisfaction of the outstanding debts secured by the embargo. Instead, Smith, through Maya, instituted suit in Honduras contesting the claims. When the Honduran court appointed Smith and a second Maya employee as "depositories" (a type of operating trustee over the Lima assets), custody *and* rightful claim were both further clouded.

At the same time, Caminals filed a "Desposimiento de una Maquinaria Hipoteca" against Maya, seeking satisfaction of Lima's outstanding debts of H.L. $505,-000.[15] At issue in that action was whether

---

1972, the Lima conveyance was entered in the Public Registry.

**15.** On August 24, 1972, Caminals commenced a dispossession action in the First Civil Court of Record against Maya and its principal officers,

Smith and Gustavo Lima. Caminals alleged that he rightfully owned both the Bank's and Casanova's security interests, and demanded that either the underlying debts ($250,000, in US$) be paid, or the plant and equipment be surrendered. The Honduran court ruled that

Smith's purported purchase, on Timberlane's behalf, of the union's interest in the Lima assets had been effective to convey good title notwithstanding the original creditors' interests. The Honduran courts granted Caminals summary judgment, and appointed three custodians to oversee the safekeeping of the Lima assets.[16]

Both sides were also employing extra-judicial means [17] to regain control of the assets while the legal proceedings were pending.[18] As well as hiring lawyers in respective efforts to wrest any residual value from the Lima assets, the parties engaged in mudslinging advertisement of their dispute in the local papers, as well as questionable private hiring of government militia to take custody of assets and their opponents. It appears that both sides interpreted the ordinary course of Honduran litigation to countenance the bribery of judges and law officers, and suborn perjured testimony from prospective witnesses. That the Bank obtained governmental assistance in protecting its claims, as well as ultimately prevailed in the Honduran litigation, could be attributed to either having won upon the merits of the dispute notwithstanding the various "dirty tricks", or to the greater experience and defter hand a multinational bank wielded in a small, strife-torn Central American state. We need not, nor will we, decide that here.

After the judicial sale of the Maya assets was finally held in Honduras in 1975, Caminals acquired title to the embargoed property for U.S. $190,000. Danli applied for, and received, an offsetting embargo for Caminals' breach of his promise to sell-out the Bank's interests by acting as a turncoat witness against the Bank. The Limas, Danli, Maya and Smith ultimately agreed to and, in 1977, executed a settlement extinguishing their claims against Caminals.

## I. Procedure in United States Federal and State Courts

While these Honduran suits were still pending, the Timberlane partners brought a federal antitrust action and a California state unfair competition suit based on the Honduran conduct. In addition, various agents of the Timberlane partners initiated individual federal diversity tort claims against the Bank, all of which were related

---

the Lima equipment that Maya claimed to have purchased from the union in January, 1972, had been encumbered with, and thus was subject to, these registered security interests.

16. In October, 1972, Caminals formally requested that Smith personally, and as Maya's representative, either turn over the encumbered property, or pay the underlying debt. When Maya and Smith failed to comply, Caminals petitioned for, and obtained, further embargoes against Maya, as well as the appointment of three "interventors" who, under Honduran law, were charged with a type of trusteeship. The interventors, in an attempt to review Maya's financial records and insure against diminution in the value of the embargoed property, took over custody of the mill. Caminals also petitioned, and the Honduran courts approved, deployment of the Honduran security police to guard the mill and prevent violence from erupting. These prophylactic measures were only partially successful.

Maya subsequently accused the trial judge of bias, and obtained a change of venue, a new judge, and replacement of the three interventors with a single interventor. After a number of inconclusive court proceedings, the First Court of Appeal in Honduras (Corte Primera de Apelaciones) held, in January, 1973, that the appointment and substitution of the single interventor was illegal, and deemed null and void. The Court reaffirmed the substance of early judicial decisions, which had rendered the outside creditors, now Caminals, a priority, secured interest, superseding the purported transfer to Maya. The original three interventors were reappointed; and, in April, 1973, Caminals petitioned the court to set a date for public auction of the property.

17. The Court will not recount the numerous incidents and allegations of illegal, illicit or duplicitous conduct offered by both sides in this suit. To the extent that this conduct constituted actionable tort, these torts were cognizable under Honduran law; if criminal behavior, it was up to the Honduran officials to prosecute internal criminal codes.

18. During the following 18 months, Maya sought review of each decision in Caminals' favor, thereby delaying the public auction and judicial sale until October, 1975, when Caminals acquired the embargoed assets for about $190,-000. Although Maya had maintained that it would file a civil suit for damages it claimed resulted from Caminals' foreclosure action, it never commenced additional litigation in Honduras.

to the antitrust suit which had been assigned to U.S. District Judge Lloyd Burke (N.D.Cal.). Judge Burke dismissed the principal action: the lumber partnership's allegations of harassment by the Bank of America, frustrating its attempts at exporting Honduran lumber to the Caribbean Islands, Europe and the United States, largely in reliance upon the act of state doctrine. Judge Burke also dismissed the three diversity tort suits brought by employees of the related businesses for their personal injuries allegedly suffered during the "Timberlane incident", on the grounds of forum non conveniens.[19]

Independently, the Supreme Court of California refused to review the appellate court's affirmance of the state trial court's grant of the Bank's motion to dismiss for forum non conveniens.

Judge Burke's dismissals were reversed and remanded to this court by the Ninth Circuit in an opinion which fashions an entirely new approach[20] for evaluating when extraterritorial application of the United States antitrust laws is appropriate.[21] Our dismissal for want of subject matter jurisdiction is consonant with the instructions from the Circuit upon remand in light of the facts as developed in the course of intervening discovery.[22]

By our denial of defendants' motion, in the alternative, for summary judgment, however, we do not categorically reject the use of summary disposition, on the merits, of an antitrust claim. We merely apply the Ninth Circuit's stringent standard to such

motions. *Poller v. C.B.S.*, 368 U.S. 464, 485, 82 S.Ct. 486, 497, 7 L.Ed.2d 458 (1962).

The *Timberlane I* opinion, as well as the subsequent case law, compels this court to employ the sophisticated distinction between evaluating subject matter jurisdiction on a motion to dismiss, as opposed to treating it as a "speaking motion" under a summary judgment procedure. Definite distinction exists between use of plenary review to discern if there are disputed material facts relevant to this Court's jurisdiction as contrasted to disputed material facts relevant to the substantive requirements for an antitrust violation. We also have ascertained that review of the question of this Court's jurisdiction to hear this claim should be entertained as an initial matter, before those of the merits. Since we deem the undisputed material facts show extra-territorial application of the antitrust laws inappropriate to this case, our ruling on defendants' motion for summary judgment does not reach the merits of plaintiffs' antitrust allegations.[23]

A motion to dismiss for lack of subject matter jurisdiction may either attack the facial sufficiency of the complaint's allegations, or be made as a "speaking motion" addressing the factual support for the court's subject matter jurisdiction. *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 733 (9th Cir.1979); *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). A facial attack requires that the court accept the plaintiff's allegations as true, in

**19.** The four "related" actions referred to here as: *Timberlane Lumber Co., Danli Industrial, S.A., Maya Lumber Co. S. de R.L. v. Bank of America National T. & S. Assoc., et al.;* C 73–0792SW ("*Timberlane*"); *Gordon Sloan Smith v. Bank of America Nat'l T & S. Assoc. et al.;* C 74–0275SW ("*Smith* tort suit"); *Jorge Lima v. Bank of America National T. & S. Assoc. et al.;* C 74–02775SW, ("*Lima* tort suit"); and, *Miguel Ardon v. Bank of America National T. & S. Assoc. et al.;* C 74–0278SW ("*Ardon* tort suit").

**20.** *Timberlane Lumber Co. et al., v. Bank of America, N.T. & S.A.,* 549 F.2d 597 (9th Cir. 1976) ("*Timberlane I*").

**21.** See, *Timberlane I* at 609, 613–615.

**22.** The Ninth Circuit's opinion in *Timberlane I* specifically requires that plaintiffs attempting to apply the Sherman Act extraterritorially establish both "acts" with effects on domestic or foreign commerce of the United States, and some plaintiff with "standing" to challenge those acts. 549 F.2d at 615.

**23.** An excellent explanation of what is aptly described as "legislative jurisdiction", and its particular relevance to the extraterritorial application of laws initially drafted for domestic application is provided in Kitner & Griffin, *Jurisdiction over Foreign Commerce under the Sherman Antitrust Act,* Vol. XVIII No. 2 Boston College Ind. & Com.Law.Rev. 199, 204–205, esp. n. 33. (Jan. 1977).

evaluating whether its complaint adequately asserts the court's subject matter jurisdiction. A factual attack challenges the foundation for the plaintiff's representations of subject matter jurisdiction in the complaint, notwithstanding his averments, permitting the court to consider matters outside the pleadings, such as deposition and affidavit testimony. *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.1980), citing *Mortensen v. First Federal Savings & Loan Ass'n.*, 549 F.2d 884, 891 (3d Cir.1977); *Adams v. Bain*, supra; *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir.1981).

As a "speaking motion" to dismiss for lack of subject matter jurisdiction, the court does not attach any presumptive truthfulness to the plaintiff's allegations; in other words, "summary judgment treatment is not required for a 'speaking motion' to dismiss for lack of subject matter jurisdiction." *Timberlane I* at 602; Fed.R. Civ.Pro. 12(b)(1); 2A Moore's Federal Practice ¶ 12.09[3], at 2297–2300, 2313 (2d ed. 1975). The existence of disputed material facts does not preclude this court from evaluating for itself the merits of the plaintiff's jurisdictional allegations. *Thornhill*, 594 F.2d at 733; *Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979); *De Lancie v. Birr, Wilson & Co.*, 648 F.2d 1255, 1258 (9th Cir.1981).

Moreover, a factual attack may occur at any stage of the proceedings, with the Court having the obligation to resolve the matter of its subject matter jurisdiction by exercising its authority, as requested by motion or sua sponte, under Fed.R.Civ.Pro. 12(h), to ascertain whether the facts underlying the allegations support jurisdiction. See, *Berardinelli v. Castle & Cooke, Inc.*, 587 F.2d 37, 39 (9th Cir.1978). If the plaintiffs' allegations fail this scrutiny, the court does not have jurisdiction to consider other substantive motions upon those pleadings; this means that the court may not entertain a defendant's motion to dismiss for failure to state a claim upon which relief can be granted, or summary judgment. *Menchaca*, 613 F.2d at 512; accord, *McLain v. Real Estate Board of New Orleans*, 583 F.2d 1315, 1324 (5th Cir.1978)

("determination that jurisdiction is wanting must displace any conclusion as to the sufficiency of the claim ....").

Nevertheless, because the plaintiff bears the burden of establishing the court's jurisdiction, (see, e.g., *Mortensen*, supra, 613 F.2d at 884, 890–92; *Menchaca*, 613 F.2d at 511; *Thornhill*, 594 F.2d at 733), the court should not resolve the jurisdictional issue until affording the plaintiff an opportunity to develop any relevant evidentiary matters bearing on that issue through discovery. *Timberlane I*, 549 F.2d at 602; c.f., *Berardinelli*, 587 F.2d at 39; *Heille v. City of St. Paul*, 671 F.2d 1134, 1136 (8th Cir.1982). In the case at bar, the plaintiffs and defendants have been permitted unfettered discovery of material relevant to our consideration of this issue. In the case of certain withheld testimonial evidence from witnesses outside the jurisdictional reach of this Court, we accept plaintiffs' allegations, as a proffer of proof in lieu of these witnesses' testimony.

Although a district court generally must treat a motion to dismiss for failure to state a claim as one for summary judgment, when considering matters outside the pleadings, a motion for lack of subject matter jurisdiction is not so converted; therefore, our consideration of the facts established by discovery does not make it proper for us to grant summary judgment for the defendants, rather than dismiss plaintiffs' complaint for lack of subject matter jurisdiction. *Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1158 (5th Cir.1981).

Yet, just as summary judgment is not favored in antitrust cases, particularly where motive and intent are at issue, dismissal of antitrust claims for want of subject matter jurisdiction is similarly disfavored where the jurisdictional issue is inextricably tied with the merits of the antitrust claims. *Chatham Condominium Assn. v. Century Village, Inc.*, 597 F.2d 1002, 1011 (5th Cir.1979); see, *Mortensen*, 549 F.2d at 892–96. Arguably, in such instances, disposal of the complaint under a Fed.R.Civ.P. 12(b)(1) proceeding lacks the

safeguards intended by holding the court to a more plaintiff-oriented stance under Fed.R.Civ.P. 12(b)(6) dismissals for Fed.R. Civ.P. 56 motions.

However, in the case at bar, two factors overcome our initial reservations against summary disposition of antitrust complaints. First, both sides have been afforded an adequate opportunity to discover, and have supplied this court with, more than sufficient factual material by which we may determine our jurisdiction over the complaint.[24] Second, in presenting its opposition to defendants' motion to dismiss for lack of jurisdiction, plaintiffs do not adequately distinguish between the substantive requirements of a well-plead complaint seeking domestic application of the antitrust laws, from that seeking extraterritorial application of those laws.[25]

Here, the facts which are relevant to determining the appropriateness of applying antitrust laws to evaluate the plaintiffs' claims are largely undisputed, and are sub-

tly different from those relevant to determining an antitrust defendant's liability. Summary dismissal is appropriate if the facts relevant to a determination of the jurisdictional issue are different from those underlying the allegations of anticompetitive practices. Indeed, the 9th Circuit has held that a party is entitled to have the jurisdictional issue submitted to a jury only where that jurisdictional question: whether the extraterritorial reach of the Sherman Act extends to the alleged restraint on U.S. foreign commerce, and the substantive issue of whether the conduct is violative of the Sherman Act, are factually so "completely intermeshed" that the question of jurisdiction depends upon a decision on the merits. *Berardinelli*, 587 F.2d at 39.[26]

■ Since the jurisdictional and substantive issues underlying our review of plaintiffs' antitrust complaint are not identical, this Court need not render, de facto, a determination on the merits of the plaintiffs' claim merely by reaching one on the

---

**24.** We acknowledge that plaintiffs had sought additional discovery in connection with the merits of their allegations. However, even assuming that Pazmino and Bonheur were within the subpoena range of this Court and were to testify substantially as the plaintiffs proffer, our holding that we should not exercise extraterritorial jurisdiction over the antitrust claims is founded on the plentiful record before us. Whether or not Bonheur "made a bundle" from his actions on the Bank's behalf, we assume that the Bank and the Branch mutually reached the decision to liquidate the outstanding Lima loans, and not to negotiate a settlement with Timberlane. Although we might have some reservations about entering summary judgment on the defendants' behalf with outstanding discovery under Fed.R.Civ.P. 56(f), we have no such hesitation under this jurisdictional inquiry. *See, e.g., Lucas et al. v. Bechtel Corp.*, 633 F.2d 757, 758 (9th Cir.1980). We note that the Circuit, as well as district courts in this and other circuits, carefully scrutinizes summary dispositions in factually complex litigation; we have applied a rigorous standard of proof to defendants' claims of plaintiffs' deficiencies of evidence on the Timberlane I tripartite test, and conclude that, on the issues material to that determination, there is neither material issue of fact to be culled from the submissions, nor is there inference or reference to such evidence favorable to plaintiffs which, even taken in the most favorable light to defeat dismissal, could support such a result. *C.f., Smith v. Gross*, 604

F.2d 639, 641 (9th Cir.1979); *Black v. Payne*, 591 F.2d 83, 89 (9th Cir.1979). *Also see, Grafon Corp. v. Hausermann*, 602 F.2d 781, 783 (7th Cir.1979).

**25.** Similar tests have been applied in contract; see, e.g., *Vespa of America Corp. v. Bajaj Auto Limited*, 550 F.Supp. 224 (N.D.Cal.1982); *Compania De Gas de Nuevo Laredo, S.A. v. Entex*, 686 F.2d 322, 325–26 (5th Cir.1982); *Thom. P. Gonzalez v. Consejo Nacional, etc.*, 614 F.2d 1247, 1253 (9th Cir.1980); in securities; *see, e.g., Leasco Data Processing Equipment Co. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir.1972), *also see*, Comment, *The Transnational Reach of Rule 10(b)(5)*, 121 U.Penn.L.Rev. 1363, 1393; in intellectual property; *see, e.g., Wells Fargo & Co. v. Wells Fargo Exp. Co.*, 556 F.2d 406, 426–31 (9th Cir.1977); *Centronics Data Computer Corp. v. Mannesmann*, 432 F.Supp. 659, 662 (D.N.H. 1977); libel; *see, e.g., De Roburt v. Gannett Co.*, 548 F.Supp. 1370, 1374 (D.Hawaii 1982); and environmental/conservation litigation; *see, e.g., Conservation Counsel of Western Australia, Inc. v. ALCOA*, 518 F.Supp. 270, 274–76 (W.D.Pa. 1981).

**26.** See Ongman, *Be No Longer A Chaos: Constructing a Normative Theory of the Sherman Act's Extraterritorial Jurisdictional Scope*, 71 Nw. U.L.Rev. 733 (1977); Atwood & Brewster, *Antitrust and American Business Abroad*, 2d ed., (1980), pps. 156–162.

procedural issues. Because extraterritorial application of the substantive antitrust laws is inappropriate upon consideration of all relevant facts, we are without jurisdiction to entertain plaintiffs' allegations upon its substantive claims. *Chatham,* 597 F.2d at 1012; see, *Rosemound Sand and Gravel Co. v. Lambert Sand & Gravel Co.,* 469 F.2d 416, 418 (5th Cir.1972).

However, a wee peek at the merits of the plaintiffs' substantive allegations convinces us that, even if plaintiffs' proffer of evidence in opposition to the defendants' motions were to be wholly unobjectional, admissible *and* probative, plaintiffs' allegations do not justify exercise of this Court's jurisdiction. Our jurisdiction is not supported by every conceivable repercussion on U.S. commerce, even if occasioned by the most reprehensible business torts; "only those injuries to United States commerce which reflect the anticompetitive effect of the violation, or of anticompetitive acts made possible by the violation, constitute effects sufficient to confer jurisdiction." *National Bank of Canada v. Interbank Card Ass'n,* 666 F.2d 6, 8 (2d Cir. 1981).

It appears to this Court, upon reviewing all the evidence in this matter, that this lawsuit—essentially a group of separate tort actions which were deemed unsuccessful in Honduran courts—has been repackaged as an antitrust case in an attempt to subvert prudent and traditional limits upon applications of our laws to foreign conduct and actors. We commend plaintiffs for their perseverance and indefatigable enthusiasm, as well as their building the quintessential Trojan horse from the ashes of their aborted investment in Honduras.

However clever the draftsmenship, regardless of what discovery could be extracted from the Bank and its agents, no edifice of antitrust claims could withstand the inherently rickety foundations upon

which this suit rests. If we were to decide, *arguendo,* that dismissal for lack of jurisdiction were inappropriate, we would most likely conclude that summary judgment could be granted to defendants for the failure of plaintiffs to produce sufficient evidence on the substantive elements of their claims.[27]

Second, although we are well aware of the reluctance and skepticism with which trial courts should consider defendant motions for summary judgment in complex antitrust litigation, we note that it is not, nor has it ever been, the law of this Circuit that federal district courts must abstain from enforcing the constitution's strict requirements for jurisdiction to consider a controversy because such scrutiny would result in disposition of the matter short of trial.

Such early disposition should not be precluded merely because the substantive allegations involve issues of antitrust; when properly considered, disposition of a controversy on preliminary jurisdictional grounds provides a valuable means of conserving scarce judicial time and resources. *Coca-Cola Co. v. Overland, Inc.,* 692 F.2d 1250, 1257 (9th Cir.1982).

Balancing the interests of the private parties now before this court against the interest of the United States legal system in preserving the legitimacy and fundamental fairness of its laws, we determine that to permit the further maintenance of this suit, on the pretext that plaintiffs' allegations are properly within the scope of our antitrust laws, would dilute those very laws beyond legitimacy.[28]

II. *Statement of the substantive test of international antitrust:*

■ Under the "effects" test first outlined by Judge Learned Hand in *United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945), even wholly foreign

---

**27.** *See Menchaca v. Chrysler Credit Corp.,* 613 F.2d 507, 512 (5th Cir.1980).

**28.** Compare the recent *Laker Airways Limited v. Pan American World Airways, et al.,* 568 F.Supp. 811 (D.D.C.1983), order filed March 9, 1983, in which Judge Richey addresses KLM's argument

that perhaps there would not be antitrust jurisdiction to consider Laker's allegations. This case and *Laker,* supra, are easily distinguishable on their facts (see *Laker, supra,* at n. 21 and 22); indeed, *Laker* is a recent touchstone of an appropriate extraterritorial application of U.S. antitrust laws.

conduct may come within the sweep of the antitrust laws if it has a sufficient effect on U.S. interstate or foreign commerce; it is probably unnecessary for that effect to be both substantial and direct, as long as it is not *de minimis.* See, *Timberlane,* 549 F.2d at 611–12. Initially, a critical factor is whether the plaintiffs can show that the defendants' method of enforcing its security interest in the Lima assets was intended to, or did, have an anticompetitive effect upon a relevant geographic and product market in the United States.

Yet, because this classic Alcoa test failed to take account of important considerations of international comity, reciprocity and foreign policy, the Ninth Circuit substantially modified the applicable standard by which to assess the complaint's jurisdictional sufficiency, when the plaintiffs here sought application of the U.S. antitrust laws to its allegations. In evaluating whether the plaintiff has alleged a cause appropriately within the extraterritorial reach of the Sherman Act, we have balanced the impact of the Bank's conduct on U.S. commerce against the potential ramifications of asserting jurisdiction. See, *Timberlane* at 611–614; *Mannington Mills,* 595 F.2d at 1294–98; *Dominicus Americana Bohio v. Gulf & Western,* 473 F.Supp. 680, 687 (S.D.

N.Y.1979). The framework of this balance is designed to detect when the U.S. interests in the "foreign" dispute are too weak—and the interests of restraint from extending our substantive law to judge that dispute too strong—making assertion of jurisdiction inappropriate. Timberlane I at 609.

We measure the relative strengths of these interests by considering whether: (1) the alleged restraint affects, or was intended to affect, the foreign commerce of the United States; (2) the deed was of such a type or magnitude so as to be cognizable as a violation of the Sherman Act; and (3) an extension of extraterritorial jurisdiction would violate international comity and fairness. *Timberlane I* at 615. In refashioning our approach to applying U.S. statutory law—here antitrust—the Ninth Circuit split the traditional talismanic "act of state" doctrine into two branches: political affront to a sovereign and choice of law. If there is a political question involved, the court usually chooses to drop the matter, citing the act of state doctrine.[29] If not, we pick up the choice of law analysis to assess which body of law—U.S. or foreign—should be applied, in light of the quantity and quality of the parties' contacts.[30]

**29.** Act of state emerged after *Timberlane I,* at least in this Circuit, as a much more restrictive and arguably more effective defense to application of U.S. antitrust laws, *inter alia.* The new criterion appears to be whether the exercise of sovereignty involves the public interests of the foreign state, as compared with the interests of private citizens. *Timberlane I* at 605, quoting *Restatement (Second) of the Foreign Relations Law of the United States* § 41 Comment d (1965). Under this standard, the decisions of the lower courts of Honduras were no longer sacrosanct from this Court's scrutiny, simply because each was an official expression of a sovereign state's view of private property interests within its boundaries, or as between individuals submitting themselves to its jurisdiction.

However, we do not take the Circuit view of act of state beyond its reasonable meaning. For example, clearly we should not immunize the Bank or its agents, simply because they have secured one or more favorable court decisions adjudicating their superior claim to certain assets in Honduras. Here, these court decisions both (1) merely provide part of the rich factual texture of intrigue in this case; and, (2) appear

to be only a neutral application of Honduran law. *C.f., Clayco Petroleum Corp. v. Occidental Petroleum Corp.,* 712 F.2d 404, 406 (9th Cir. 1983). But, we do not look beyond the face of the court proceedings, unless violative of a properly extraterritorial restriction like the Foreign Corrupt Practices Act or Securities Act of 1933 on its own merit, to "impugn or question the nobility of a foreign nation's motivation." *Timberlane I,* 549 F.2d at 607.

**30.** There is room however, for consideration of the extent and quality of redress that a dispute, which presents itself to a U.S. court, has been afforded in another jurisdiction, as part of the third prong of the *"Timberlane test".* In probing the value or intrinsic propriety of juxtaposing our antitrust doctrine into a ripened tort suit, we do take note of the exhaustive scrutiny which the parties underwent in Honduras, and the juridical facts that emerge from that litigation.

We feel that courts are appropriately sensitized to the "gray" area between absolution upon act of state considerations, and discounting any government interests which fall short of

Assessing the factors under this "jurisdictional rule of reason", we believe that extraterritorial application of the Sherman Act is inappropriate in this case. This process is a question of law, determinable from the relevant and admissible evidence presented to the court in an expedited fashion by the parties on litigants' or court's insistence. Although we do not believe this is a matter solely within the trial court's discretion, our findings upon the parties' submissions are entitled to the same deference typically accorded judicial determination of fact.

In order to weigh the comparative interest of the U.S. in providing a forum for the plaintiffs with the negative ramifications of extraterritorial applications of the U.S. antitrust law, we must assess, at a preliminary stage, the anticompetitive effects of the Bank's and its agents' actions, including whether they occurred in the U.S. or in Honduras; whether the markets affected were in the U.S. or abroad; and whether any indirect anticompetitive effects in the U.S. or abroad were foreseeable or intended. We must also consider the plaintiffs' suit and its relationship to this forum: whether U.S. citizenship of, or ownership interests in, the plaintiff are significant factors militating our jurisdiction, or whether the plaintiff's access to or recourse in a foreign court has provided it meaningful opportunities for redress of its allegations.

Finally, although the judiciary is the most ill-equipped branch of the U.S.

government to do so, we are charged to make a limited inquiry into the effect of the defendants' and plaintiffs' actions upon U.S. foreign policy. We have divided this into two parts: the anticipatable annoyance or infringement that Honduras might feel if rulings in this matter were to have the effect, *albeit* indirectly, of rendering an "advisory" judgment on the state of their domestic lumber industry [31]; and the broader implications of an unwarranted export of our antitrust laws to Honduras.

Although less apparent, and arguably less crucial, we consider the extensive Honduran litigation of this matter very relevant both to assess the recourse provided the plaintiffs on their allegations, as well as to alert us to the real possibility of causing the sovereign state embarrassment by reopening matters which have been afforded full and fair process. If this were an instance of a domestic court's consideration of a matter litigated in a domestic counterpart's courts, our inquiry would be at an end. We believe that to provide the type of forum which the plaintiffs seek here would, of necessity, require us to look behind Honduran law, into court process and internal workings, in a manner that has traditionally been disdained under the recognition principle. On a policy level, this plenary examination would establish a dangerous precedent.

### A. *"Effects test"*

Although similar in some measure to the standard appropriate on summary judg-

---

this rigorous standard. Here, we feel that the fact that this litigation centers around the lumber industry of Honduras, certainly a crucial aspect of its patrimony, demands that we interject our antitrust overlay more cautiously because comity contemplates such sensitivity. In this regard, brief mention should be made about the effect, if any, of an official expression of the Honduran government, which is one of those "gray areas".

**31.** In the Diplomatic Note 148, the executive branch of the Government of Honduras expresses some concern over the effects that this litigation may have in three respects. First, that the antitrust complaint in this action is based upon notions of law which are "unrecognized" in Honduras. Second, that the lawsuit seeks to

rehash a matter finally litigated in Honduras, with a *res judicata* effect. Third, the action seeks to regulate conduct in a state-regulated (COHDEFOR) industry. Additionally, plaintiffs were, by official communication from the Honduran Attorney General, offered an "adequate" forum in Honduras for dispute resolution. DX 179. Notwithstanding this Note, and the defendants' arguments, we do not accord this communication much independent significance. When compared to the vehement opposition mustered in other instances of extraterritorial application of U.S. laws, this solicited communication pales. *See* Atwood & Brewster, *supra* Chapter 4: Foreign Interests and Reactions, pps. 82–86. We do consider it within our balance of comity issues, *infra*, along with a survey of Honduran law applicable to this dispute.

ment, by requiring a showing of some effect, actual or intended, upon U.S. foreign commerce, the "jurisdictional rule of reason" legitimizes the exercise of a consideration of the plaintiffs' allegations under our laws. While the sophistication and subtlety of modern commerce have rendered the strict territoriality test of American Banana impractical, and the intent and effect test a bit too amorphous, recent cases grappling with the concerns which led these early courts to attempt guidelines by which to provide some legitimacy to extraterritorial application of statutory law, have suggested a way to apply the Circuit's mandate in this case.

We take the plaintiffs' allegations of an anticompetitive effect in a relevant product market as true, as if this were a Fed.R.Civ. Pro. 12(b)(6) motion. See *Zenith Radio v. Matsushita Elect. Indus. Co.*, 494 F.Supp. 1161, 1171 at ft. 21, 1175, 1177 (E.D.Pa. 1980). The central inquiry is whether the plaintiffs ever were potential competitors in the markets that they allege were actually, or were intended to be, rendered anticompetitive. To assess actual, or intended anticompetitive effect, it is necessary for the plaintiffs to define a product and geographic market to which they sought to supply, and to establish that they possessed the resources to do so.[32] The plaintiffs allege that their combined efforts to establish themselves in Honduras as a viable supplier of varying quality of Honduran pine to the United States, were sufficient to confer upon them the requisite interest to be safeguarded under U.S. antitrust law. Plaintiffs allege two such markets: supplying crossarms and utility pole nationally and supplying the Southeastern United States and Gulf Coast states—particularly Florida, the Virgin Islands and the Commonwealth of Puerto Rico—with lumber for housing. A third market, that of use nationally in high-grade specialty products, had not yet been entered. Naturally, plaintiffs fix responsibility for their inability to compete upon the Bank, by its refusal to permit them greater opportunity to "work"

off the Lima mill debts, and by "squeezing" the mill into insolvency.

Although we would explore the plaintiff's level of participation and volume of commerce in these markets with a more skeptical eye below if assessing the merits of defendants' motion for summary judgment, we do not have that task here. We agree here with the plaintiffs; by alleging the ability and willingness to supply cognizable markets with lumber that they allege would have been competitive with that already in the marketplace, they have satisfied this prong of the Circuit's test. As for the plaintiffs' allegations of the Bank's intentions to frustrate its production and sale of Honduran lumber, construed in the light most favorable to the plaintiffs, at most the Bank could reasonably have anticipated that, by assigning its valid security interest for collection to Caminals, via Casanova, as an independent contractor, it remained susceptible to antitrust liability.

However, even if we accept plaintiffs' assertions in toto, the Bank's intention to maximize collection of that valid security interest, using all means at its disposal permitted under Honduran law, is not tantamount to an intention to crush the plaintiffs' participation in the marketplace. At best, a reasonable interpretation of the plaintiffs' allegations would be that the Bank knew, or reasonably should have foreseen, that the inevitable result of pressing its interests in the manner it chose would doom the plaintiffs' efforts to revitalize the mill.

It is not at all clear that the Bank's knowledge—that enforcing its legitimate security interest against otherwise productive assets would frustrate a potential entrant's competitive efforts—constitutes a sufficient basis upon which to assess antitrust liability. In its simplest form, the plaintiffs would have us rule that, as a matter of law, a United States multinational corporation cannot enforce its rights under another jurisdiction's commercial law, in the means permitted by that jurisdiction,

---

**32.** *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 394, 76 S.Ct. 994, 1006, 100 L.Ed. 1264 (1956); *Fount-Wip v. Reddi-Wip*, 568 F.2d 1296, 1301–1302 (9th Cir.1978).

if a foreseeable result of its action is to foreclose commercial opportunities to U.S. interests in that country. In this case, plaintiffs seek to attach those commercial opportunities to an entity comprised of U.S. citizens; however, any entitlement to this Court's jurisdiction which is argued on this theoretical, and easily manipulated, basis fails to address the concerns which provoked the three part "Timberlane test". The better, and more logical, line is the quality and quantity of the nexus between the defendants' conduct and the U.S. See, e.g., *Leasco Data Processing Equip. Co. v. Maxwell*, 468 F.2d 1326, 1341 (2d Cir.1972); Restatement (Second) of the Conflict of Laws §§ 37, 50 (1971); *Centronics Data Computer Corp. v. Mannesmann, AG*, 432 F.Supp. 659 (D.N.H.1977); *Chrysler Corp. v. Fedders Corp.*, 643 F.2d 1229 (6th Cir.1981) cert. denied 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); *I.S. Joseph Co., Inc. v. Mannesmann Pipe, et al.*, 408 F.Supp. 1023 (D.Minn.1976).

Other courts have recognized, as has the Ninth Circuit implicitly in this test, that assessment of the effect of the defendants' conduct within the forum may delay decision of the matter of the court's jurisdiction. *Cascade Steel Rolling Mills, Inc. v. C. Itoh & Co.*, 499 F.Supp. 829, 840–41 (D.Or.1980).

In this instance, we have grave doubts, after considering the plaintiffs' evidence, that either the Branch's or its agents actions, or the infinitesimally small quantity of Honduran pine which could have, under the certification requirements and competitive conditions existing at the time of Timberlane's foray in Honduras, could have possibly affected U.S. foreign commerce in the previously defined product or geographical markets. Although plaintiffs allege the Bank's San Francisco office conspired to frustrate Timberlane's activities, the evidence in the record, at best, supports only the conclusion that the "head office" had grown perturbed with the Branch's failure to protect the Bank from exposure to potential loss on an unjustifiably increasing extension of credit to Lima and, although willing to discuss the effects of its decision with Timberlane's agents, the San Francisco office was unwilling to forestall its recourse to liquidate the outstanding indebtedness against Lima's assets.

There is no evidence linking the home office of the Bank to an anticompetitive scheme or monopolistic attempts by the other Honduran lumber producers; one can assume, if Congress were faced with drafting the Sherman Act legislation today, in light of the increasing complexity of regulating conduct of the many multinational corporations with significant contacts with the United States, it would render more explicit guidance as to the Act's intended reach of foreign subsidiary conduct. However, as it is posed before this Court, the evidence presented in the record could not establish an anticompetitive intent even at the subsidiary level.

However, upon the evidence submitted by Timberlane on the issue of the extent to which the Bank's decision necessarily precluded its foray in the enumerated lumber markets, we assume that the "very low threshold", intended to restrict only the most trivial of claimed effects, has been met.

### B. Timberlane's Standing to Assert Antitrust Claims:

There are four different impediments to Timberlane's maintenance of this action on behalf of the persons, real or juridical, whom it claims were injured in the manner proscribed by the U.S. antitrust laws. Briefly, these arguments are: (1) that Lima, not Timberlane or any of its investors, was the entity within the target area of the Bank's acts; (2) that, at best, Timberlane merely held a derivative interest in an entity engaged in the Honduran lumber industry; (3) that Timberlane was not injured in the manner in which the antitrust laws were designed to protect competition; finally, (4) that the Bank neither held, nor sought, monopoly power in the lumber industry.

Although Timberlane sought to dedicate the Lima assets to use by its family of related "shell" corporations, at best its activities were contemporaneous with, or just

a bit after, the Bank in San Francisco's order to its Honduran branch to liquidate Lima's outstanding indebtedness was finally heeded. In addition to a failure of its evidence to support a link other than that an inevitable and, necessarily contingent, interest of a creditor in his debtor's financial fortunes, there is no theory upon which even the plaintiffs would seek to hold the defendants liable. The most obvious gap in the plaintiffs' standing is the apparently uncontradicted conclusion from the evidence that the plaintiffs' allegations focus upon deeds of the Honduran branch personnel committed long before Maya had even been organized to operate the Lima mill. The injuries to the other related entities, as plaintiffs concede, resulted from its attempts to shift or transfer assets from Maya to the other companies.

Additionally, Timberlane's interests in Maya, Danli, Pinex and in the assets which it sought to acquire from Lima were derivative at best. An attempt to assert a shareholder's or partner's interest in a competitive enterprise allegedly injured by reason of anticompetitive acts is not cognizable. Danli was organized in 1971; stock was issued to a U.S. partnership, Pine Products (67%); 20% to Honduran individuals; 6% to United States citizens, in exchange for future services to the corporation; and only 7% actually was distributed to the Timberlane partnership.

Maya was organized later in 1971, owned principally by Herb Robbins and his wife. Although plaintiff's best case for standing to challenge the legality of the Honduran branch's deeds is based upon its various allegations of injury to Maya, these allegations focus upon the branch's conduct prior to Maya's formation.

Timberlane was a partnership primarily engaged in uncovering opportunities in lumber supply for its wholesaling activities in the United States. It never was in the position to exploit opportunities in Honduras that it alleges were blocked by the Bank, since it never was legally registered to export lumber from Honduras, regardless of that supply's unmarketability in the United States.

It is clear from the evidence submitted on behalf of its complaint that Timberlane's standing is deficient in two respects. Not only has its showing that it was the target of any anticompetitive actions by the Bank fallen short of convincing us that it was within the "target area" of anticompetitive animus, but also it has failed to overcome a presumption of duplicate recovery or complex damage apportionment between splintered proprietary interests, all equally (if adversely) affected by the defendants' actions.

Finally, the plaintiffs have produced no evidence that the defendants attempted to gain, or possessed, even by derivative interest, any monopoly power in the Honduran lumber market.

Nonetheless, the Circuit's articulated standard for permitting an aggrieved plaintiff standing to bring suit is a minimal threshold.[33]

Timberlane alleges that, by the formation of the conspiracy between the Branch and the other lumber companies in Honduras, it had established itself as a viable potential entrant to the U.S. market. Although it makes little business sense that the Bank would choose sides against Timberlane's efforts when, from the evidence, it does not appear any of the other lumber concerns to which it had lent money were successfully or significantly committed to U.S. export opportunities, we assume *arguendo* that the Bank did actively engage in actions with an intention to frustrate Timberlane's investment. We need not speculate or justify the Bank's reasons for demanding that Timberlane repay the outstanding Lima debt if it wished to use the

---

**33.** *Timberlane I, supra,* at 615. The Circuit did not consider on appeal the issue of whether the apparently twice-removed injury for which Timberlane seeks redress here is sufficient to confer antitrust standing. We believe that the double attenuation: first, because the allegedly anti-competitive acts were directed at Lima, not Maya; and second, because, at best, Timberlane's interest in the activities of Maya was that of a shareholder, would normally bar Timberlane from suit, for lack of standing.

assets; certainly, according to the applicable Honduran law, in substantial harmony with the law of this jurisdiction, the Bank had a valid security interest secured by the Lima assets. Plaintiffs' novel interpretation of the legal effect of the Bank's auditors conformance to the generally accepted accounting procedure of acknowledging a substantial uncertainty of full collection on the Lima debts, while bold, is patently ridiculous. In fact, the Bank's action in "writing down" the Lima account is more valuable evidence of the rationale of the Bank in assigning the debt for collection by various nationals as agents.

Regardless of the intentionally low, and admittedly permissive, threshold at which the Circuit has established standing in this tripartite inquiry, its requirements do pose an insurmountable barrier to the plaintiffs' standing here. Even if we were to overlook the plaintiffs' failure to qualify legally in Honduras to compete in the export of lumber, or as a commercial matter in the United States, by obtaining the ASLA grading necessary to market its product, as well as accept the tenuous proposition that the Bank maintained the requisite stake in its competitors allying it for antitrust purposes with a putative cartel, we cannot accept Timberlane's arguments of standing for two overriding reasons.

First, were we to impute the Branch's, or the San Francisco headquarters', mischievous deeds against Lima to Timberlane, we would commit two errors of substantial magnitude. First, mindful of the Supreme Court's admonition that the antitrust laws protect competition, not competitors, we are reluctant to permit Timberlane to purchase Lima's cause of action, especially in view of its unwillingness to purchase the assets free and clear of valid security interests. Second, if we were to scrutinize the Bank's actions which give rise to any cognizable action at law, we would conclude that they were directed at Lima; by preventing Timberlane's circumventing its security interests, the Bank unavoidably frustrated Timberlane's speculation in the assets which secured the Bank's loans to Lima. However, to take the heroic leap which plaintiffs encourage here, we would be endorsing a form of no-fault antitrust liability upon creditors, who by enforcing their legal security interests, necessarily halt the productive life of those assets. We think that the absurdity of this result is not mitigated by plaintiffs' quickness to reconstruct speculative U.S. markets to which it might, given other hypothetical factors, have been able to supply lumber.

### C. *Comparative Interest Analysis of Relevant Factors in Extraterritorial Application of Antitrust Laws:*

The comparative interest analysis suggested by the Circuit can best be applied in three parts: would we strain U.S. antitrust law beyond credibility by applying it to these facts (choice of law); in light of Honduran consideration of the plaintiffs' allegations, would this Court's consideration be redundant or a source of tension between the U.S. and Honduras, the U.S. and other sovereigns, or a U.S. multinational and the nations in which it conducts business (most appropriate forum); and, notwithstanding the inappropriateness of applying U.S. law to the complaint, or the opportunity for creating resentment between sovereigns or tension between multinational corporations and their host countries, whether the complaint alleges acts or intentions with nefarious, and more than *de minimis,* effect upon competitive conditions in the U.S. domestic or foreign marketplace.

Turning first to the appropriateness of applying U.S. antitrust law to the plaintiffs' allegations, we deem Honduran law clearly superior by which to judge defendants' conduct, and to provide plaintiffs with any remedies appropriate. Although plaintiffs have brought this action styled with U.S. citizens on both sides, we look through the formal pleadings into the substance of the action. The true nature of the complaint is an action in tort and contract by the Limas against certain personnel of the Bank's branch in Honduras. At best, the United States citizens' interests in the matter are derivative: Timberlane to the Lima concern, Bank of America in San Francisco,

as the parent corporation. All of the crucial percipient witnesses to the incidents were either Honduran citizens or residents; almost all of the events which form the basis of this suit occurred in Honduras. The only United States citizens or interests involved in this incident clearly, and consensually, conducted their affairs subject to Honduran contract, tort, civil and penal law.

In this case, the tortious conduct of which the plaintiffs complain occurred in Honduras. Were this simply a straight-forward tort complaint, the only legitimate choice of law would be Honduran; in this event, we would clearly dismiss for *forum non conveniens*.[34] Narrow exception to this rule is taken in the case of a tort, such as antitrust or environmental contamination, where the offending actions have substantial effect upon parties before the courts of those distant jurisdictions. Here, given the indisputably nascent efforts of the plaintiffs to establish a chain of somewhat related enterprises to produce lumber in Honduras, with an eye to eventual export, if ever legally and commercially feasible, the directly anticompetitive effect of the Bank's decision to liquidate Lima's indebtedness was felt in the marketplace in which the Lima assets supplied lumber: Honduras and, to a far less degree, the Caribbean. Although Lima and the Timberlane entities may have consummated some sales in Puerto Rico and negotiated toward others in Florida, any effect that Lima's demise had upon competitive conditions in the U.S. foreign was *de minimis*.[35]

Unlike the first prong of the *Timberlane* test, in this inquiry the weight, as opposed to the mere existence, of the commerce is significant. The minimal commercial opportunity for Honduran lumber in the U.S. is important to our assessment of whether the Bank's actions could have been intentionally directed at, or their effect predictable upon, U.S. commerce in lumber. Were we to apply either the traditional territorial, most significant relationship, or comparative interest analysis tests of conflicts of law, we would select Honduran law for application.

This is precisely what the Honduran courts afforded plaintiffs' complaint. Any further consideration by the federal court system in the United States would be both redundant, as well as a dangerous signal of American xenophobia and provinciality.[36]

Adequate and fair process was accorded the injured parties; simply cosmetic alteration of the litigating party cannot circumvent this fact.[37] Appropriate remedies were available to the plaintiffs under Honduran law; certainly the volume and variety of the legal proceedings verify the ample procedural avenues open to plaintiffs. We accept the foreign judgments on the existence and validity of security interests encumbering the Lima assets, as well as the

---

**34.** See, Ongman, supra at 752.

**35.** Plaintiff alleges that, at its height, Maya and Danli were responsible for approximately one and one-half percent of the pine market in the U.S., in the relevant product markets. Although this may be a sufficient *showing to satisfy the* first prong of the three-prong test, we do not consider this of such a magnitude to carry the day on the third prong. *C.f., Daishowa Intern'l v. No. Coast Export Co.,* 1982–2 Trade Cas. ¶ 64,774 (N.D.Cal.1982) No. 81–574 RPA (May 24, 1982); *Industrial Investment Dev. Corp. v. Mitsui & Co.,* 671 F.2d 876, 884–85 (5th Cir. 1982); *Montreal Trading Ltd. v. Amax, Inc.,* 661 F.2d 864 (10th Cir.1981); *Dominicus Americana Bohio v. Gulf & Western Industries, Inc.,* 473 F.Supp. 680, 687 (S.D.N.Y.1979).

**36.** *Also see* 49 Antitrust Law Journal 1191, 1197 (1980).

**37.** Nothing in plaintiff's affidavits, especially affidavit 27 prepared by Serapio Hernandez Castellanos, then Attorney General of Honduras, dispels this conclusion. Although, upon summarizing relevant sections of the Commerce Code; e.g., Articles 422, 423, 424, and 425, he apparently concluded, in response to a very abstract hypothetical question, that

(t)he Government of Honduras would not object to the exercise of antitrust laws, if such application does not violate or waive the fulfillment of the Honduran rights, both internal and international, and does not harm Honduran persons, or otherwise compromise or harms (sic) our sovereignty.

Castellanos aff. at 4, this is not the inquiry before this Court. Our inquiry is not merely whether we *could* legitimize an antitrust inquiry into the actions of various parties in Honduras, but rather whether we *should.*

judicially decreed measures, which interrupted Timberlane attempts at a "leveraged buy-out" without creditor cooperation. We note no conflict of philosophy between U.S. and Honduran law on this point.[38] Were this a judgment of a sister state within the U.S., the principles of collateral estoppel and res judicata would dispose of most of plaintiffs' allegations here.

We do find indications of opportunities to create needless tensions by our consideration of these allegations. Although the meaning of the Honduran diplomatic note is equivocal, a U.S. Court would by necessity have to overlook the practical sensitivity of our interference, which in any degree, would be superfluous, with an industry heavily regulated by another sovereign state, as well as in an internal incident which has already consumed extensive Honduran judicial resources.

In assessing the effect that our consideration of this matter would have, we cannot say that our consideration of the matter under U.S. antitrust standards would be appropriate even if all the acts alleged by Timberlane to have been taken by the Bank are true. The only form of relief which would be awarded, treble damages, would

penalize the Bank for its status as a United States national only[39]; under such a rule, other multinational organizations would be subject not only to liability for their host country's law, economic community laws, United States laws applicable properly extraterritorially, but also to a type of russian roulette tort liability if their adversary can sell rights to an antitrust claim to a United States entity, for prosecution of the suit. This quest after a deep-pocket U.S. defendant, with none of the safeguards provided by prosecutorial discretion in criminal antitrust, or agency enforcement actions, would have virtually no saving grace.[40]

 As for the three pendent state tort actions, we dismiss each on the basis of *forum non conveniens*. The witnesses, the parties, and dastardly deeds all were Honduran; these suits would clearly require us to apply Honduran law to assess liability or damages from the bank branch's activities.[41] Certainly these tort actions should properly be brought in that forum.

Timberlane's principals took a gamble by attempting to pursue a chimerical investment. Their lack of sensitivity to cultural,

---

**38.** Our understanding of the Circuit's guidance upon remand for our application of this new test, is that compatibility of the two legal systems is necessary, but not sufficient to rest extraterritorial jurisdiction upon. Having concluded that the United States and Honduras laws (*see A Statement of the Laws of Honduras in Matters affecting Business*, 4th ed., Ramirez, Dante Gabriel and Ramirez, Roberto, General Secretariat, Organization of American States, Wash.D.C., 1981, pps. 177, 202–203, 232–233) are in theoretical harmony on monopolistic business practices, banking and security interests, we note an inclination in the Honduran law to reserve more power over foreign investment in their country. Certainly, this is the sovereign's prerogative; however, under this orientation, and in view of the identity in approach to monopolization that plaintiffs urge between the U.S. and Honduras, we deem it particularly appropriate that plaintiffs have waged their litigation in Honduras. We see no prejudice to them by pursuing their theories in that country; in the balance, when viewed alongside the countervailing public policy interest in not becoming an officious intermeddler in other nations' internal affairs, when those affairs have only a *de minimis* effect on our commerce, the inhospital-

ity of this Court's forum is an appropriate result of a more appropriate forum elsewhere.

**39.** *See, e.g.,* Atwood & Brewster, supra, § 5.11, esp. at 126.

**40.** See *Panel Discussion,* 49 Antitrust Law Journal, *supra,* at 1221–1222.

**41.** For recent cases describing the modern approach to forum non conveniens, *see, e.g., Laker Airways Limited v. Pan American World Airways, et al.,* 568 F.Supp. 811 at 814 (D.D.C.1983); *Cheng v. Boeing Co., et al.,* 708 F.2d 1406 at 1407, discussing *Gulf Oil v. Gilbert,* 330 U.S. 501, 508–09, 67 S.Ct. 839, 843, 91 L.Ed. 1055 (1947). Here we conclude that the Bank has made a "clear showing of facts" which establishes that plaintiffs' prosecution of this action in this forum is an attempt to relitigate matters which already have been addressed in Honduras, as well as those speculative "pie in the sky" theories which, in light of "considerations affecting the court's own administrative and legal problems" applying U.S. antitrust laws to this affair, should have been properly before the Honduran courts instead. *Cheng, supra,* at 1411, quoting *Miskow v. Boeing Co.,* 664 F.2d 205, 208 (9th Cir.1981).

legal and technological differences between the U.S. and Honduras was the real culprit, if there be one, responsible for their losses. Honduras, while undoubtedly accommodating to foreign investment, be it smaller companies like Timberlane or large multinationals like the Bank, is entitled to the respect of this Court.

Respect takes many forms as this Circuit has admonished us. Regard for the codification of its cultural, business and ethical mores, as well as the integrity of its system of justice, leads us inextricably to conclude that we need DISMISS these actions. IT IS SO ORDERED.