**VESPA OF AMERICA CORPORATION, et al., Plaintiffs,**

v.

**BAJAJ AUTO LIMITED, et al., Defendants.**

**No. C 80–0881 SW.**

United States District Court, N.D. California.

June 23, 1982.

Ream, Train, Horning, Ellison & Roskoph, Blaine C. Janin, Richard Allan Horning, D. Peter Harvey, James R. Busselle, San Francisco, Cal., for plaintiffs Vespa of America Corp. and Piaggio & C.S.p.A.

Baker & McKenzie, Michael K. Murtaugh, Chicago, Ill., Kurt W. Melchior, Michael Wischkaemper, Severson, Werson, Berke & Melchior, a Professional Corporation, San Francisco, Cal., for defendant and counterclaimant Bajaj Auto Ltd.

G. William Hunter, U.S. Atty., Amanda Metcalf, Asst. U.S. Atty., San Francisco, Cal., for Federal defendants.

### ORDER GRANTING DEFENDANTS' MOTION FOR PARTIAL DISMISSAL

SPENCER WILLIAMS, District Judge.

This action came before the court on defendant Bajaj Auto Limited of India's (hereinafter "Bajaj") motion to dismiss all of plaintiffs' non-domestic claims. After careful consideration of the memoranda submitted by the parties and the arguments of counsel for both sides, the court granted defendants' motion, dismissing plaintiffs' breach of contract and conversion claims as well as the extraterritorial elements of the unfair competition and unjust enrichment claims.

### I. BACKGROUND FACTS.

This dispute arose out of a licensing agreement between Piaggio & C.S.p.A. (hereinafter "Piaggio"), the Italian corporation which designs and manufactures Vespa vehicles, and defendant Bajaj's corporate predecessor, Bachraj Trading Corporation, Ltd., an Indian corporation. The relationship between the two companies began twenty-two years ago in India when they entered into the first of a series of agreements by which Piaggio licensed Bachraj Trading Corporation to manufacture components and assemble both the Vespa scooter and three-wheeled commercial vehicles.

All licensing agreements between Indian and foreign firms require approval by the Indian Government. This requirement exists to allow India to protect its legitimate policy interest in promoting economic independence. Thus, the Indian Government played a strong role at each stage of the Piaggio-Bajaj interaction. For example, the first license, executed in 1960, omitted certain provisions required for approval. Under Indian law, it had to be rewritten to include these provisions. The license agreement was ultimately approved as amended on March 22, 1961. Subsequently, in December of 1964, the appropriate ministry approved an extension of the agreement as requested by the parties.

The focus of this litigation is the final manufacturing license entered into by Piaggio and Bajaj. This agreement was submitted for government approval in 1968. Indian authorities accepted the agreement upon stipulation that no further extensions would be permitted. Under the agreement, Bajaj received from Piaggio all plans and specifications necessary to construct the Vespa vehicles.

The contract expired on April 1, 1971. Piaggio asserts that Bajaj then violated the license agreement by refusing to return the plans and specifications. Piaggio contends Bajaj misappropriated the designs to "slavishly" and illegally continue to manufacture Vespa vehicles after the license expired. Bajaj maintains it tendered the plans, but Piaggio allowed it to keep them. More importantly, Bajaj claims that the last agreement between the parties was executed with the express understanding that Bajaj's right to produce these vehicles would survive the license agreement. Indeed, Bajaj argues that this was a condition of the Indian Government's approval of the final licensing agreement.

In 1980, nine years after the alleged breach of contract first occurred, Piaggio and its American distributor, Vespa of America Corporation, brought this suit. In the intervening years, Bajaj has risen to become the world's second largest manufacturer of scooters, second only to Piaggio. Bajaj scooters are sold in 171 countries. They first entered the American scooter market in 1977. To date, however, total sales have amounted to only about 1,300 scooters. The three-wheeled vehicles have never been marketed in this country.

## II. PIAGGIO'S COMPLAINT AND THE ISSUES RAISED.

Piaggio raises a federal claim for patent infringement under the Lanham Act. 15 U.S.C. § 1125(a). The claim is based on the contention that Bajaj copied non-functional features of both the Vespa scooter and the three-wheeled commercial vehicle that have acquired a secondary meaning in the marketplace. Piaggio appended four state claims to its single federal cause of action. These claims include breach of contract, conversion, unjust enrichment and unfair competition.[1]

Piaggio apparently concedes that its Lanham Act claim extends only to those sales which directly affect United States commerce. This tactical concession does not, however, eliminate all the jurisdictional problems presented in the complaint. By foregoing the transnational dimensions of its Lanham Act claim, Piaggio successfully avoids application of the *Timberlane* comity test (discussed *infra*) as a means of determining the existence of jurisdiction[2] over

---

1. 28 U.S.C. § 1338(b) provides that federal courts have original jurisdiction over claims for unfair competition "when joined with a substantial and related claim under ... the trademark laws." Although originally a codification of the *Hurn v. Oursler,* 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1938) restrictive view of pendent jurisdiction, subsequent decisions have updated the statutory interpretation to include the broader *Gibbs* formulation of pendent jurisdiction. *See e.g., Thompson Tool Co., Inc. v.*

*Rosenbaum,* 443 F.Supp. 559 (D.Conn.1977). This court assumes that this broader interpretation applies. In any case, plaintiffs fail under the more generous of the two tests and would thus fail under the more restrictive rule.

2. A question has arisen over whether the test outlined in the *Timberlane* decision is in fact one of subject matter jurisdiction. *Compare In re Uranium Antitrust Litigation,* 617 F.2d 1248, 1253–56 and *Industrial Investment Development Corporation v. Mitsui & Co., Ltd.,* 671

the federal claim. *Timberlane Lumber Co. v. Bank of America,* 549 F.2d 597 (9th Cir. 1976); *Wells Fargo Company v. Wells Fargo,* 556 F.2d 406 (9th Cir.1977) (holding the *Timberlane*-comity test applies to extraterritorial enforcement of the Lanham Act).

■ What remains to be scrutinized is Piaggio's obvious attempt to sidestep *Timberlane* by placing all the overseas conduct relevant to its case into its pendent state and foreign law claims. Briefly stated, the issue is whether pendent jurisdiction is an appropriate basis for asserting American authority over a related but wholly foreign cause of action. After a careful review of all the relevant authorities, it appears that this question is one of first impression. There is ample authority, however, demonstrating the need for judicial restraint in similar internationally sensitive areas. *See Timberlane, supra* and *Wells Fargo, supra.* In keeping with the trend towards a heightened awareness of the need to avoid international conflict, the court declines to exercise its jurisdiction over any of the wholly foreign-based claims raised in Piaggio's complaint.

### A. Pendent Jurisdiction.

■ Under the doctrine of pendent jurisdiction, a plaintiff may bring appropriate state law claims for which there is no independent federal jurisdiction by joining them with a substantial federal claim. The federal court's power to hear such claims is derived from the notion that the relationship between the state and federal claims is such that they comprise but one constitutional "case." *United Mine Workers v.*

*Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Therefore, a claim may be said to be pendent to a federal claim only if it arises out of a "common nucleus of operative fact." *Id.* As a fundamental matter, then, it is unlikely that a claim which could not be brought in state court could ever be properly pendent.

### 1) The Role of Comity in Asserting American Jurisdiction Over Foreign Conduct.

The concept of comity has received increasing attention as a consideration in determining the existence of United States jurisdiction in transnational cases. *See e.g. Timberlane, supra.* Awareness of the difficulties arising from the reactions of other countries to a particular exercise of jurisdiction is of particular importance in areas of antitrust and business regulation. *Id.* The policy reasons underlying this expanded concern are manifest. As a matter of judicial economy, the doctrine of comity must be implemented to ensure that under principles of res judicata, decisions in one country are effective and enforceable in another. Moreover, decisions will be mutually enforced only if the assertion of jurisdiction is limited by a concern for respecting another country's basic laws and policies.

While there is no doubt that United States law may extend to some conduct in other nations and may penalize acts by persons other than American citizens, there are limitations on excessive intrusions by American courts into the affairs of other countries.[3] Of course, it is ultimately Congress's

F.2d 876, 884–85 n. 7 (5th Cir.1982) *with Mannington Mills, Inc. v. Congoleum Corporation,* 595 F.2d 1287, 1297–98 (3d Cir.1979) (concurring opinion). Instead of reading *Timberlane* as establishing a test for subject matter jurisdiction, some courts have interpreted the test as a method for determining whether jurisdiction should be asserted, assuming the presence of subject matter jurisdiction. *See e.g., Industrial Investment Development Corporation v. Mitsui,* 671 F.2d at 884–85 n. 7. This court need not resolve this issue at this time, however, for the result in this case would be the same under either interpretation.

3. The Restatement of Foreign Relations Law of the United States (Tentative Draft No. 2 1981) suggests these limits:

§ 403. Limitation on Jurisdiction to Prescribe

(1) Although one of the bases for jurisdiction under § 402 is present, a state may not apply law to the conduct, relations, status, or interests of persons or things having connections with another state or states when the exercise of such jurisdiction is unreasonable.

(2) Whether the exercise of jurisdiction is unreasonable is judged by evaluating all the relevant factors, including:

task to set the jurisdictional boundaries of a particular statute. *See United States v. Aluminum Co. of America,* 148 F.2d 416 (2d Cir.1945). Absent either constitutional prohibition or a clear expression of Congressional intent, it falls to the courts to develop appropriate standards of restraint.

■ In antitrust law, the Ninth Circuit has established a complex set of factors which must be weighed and analyzed to determine when the country's antitrust laws will extend to activities concerning foreign countries or foreign nationals. *Timberlane, supra,* at 613–15. Soon after the *Timberlane* decision, the Circuit applied the same test to the extraterritorial application of the Lanham Act. *Wells Fargo, supra.* The *Timberlane* test has three elements. It requires that (1) there was some effect, actual or intended, on American foreign commerce; (2) the effect was sufficiently large to present a cognizable injury to plaintiffs; and (3) that the interest of

and links to the United States—including the magnitude of the effect on American foreign commerce—are sufficiently strong, vis-a-vis those of other countries, to justify an assertion of extraterritorial authority. *Timberlane, supra,* at 613.

The third element of the test is the main concern here. In determining the interests of various nations in a certain dispute, the court suggested the following list of factors: the degree of conflict with foreign law or policy, the nationality or allegiance of the parties and the locations or principal places of business of corporations, the extent to which enforcement by either state can expect to achieve compliance, the relative significance of effects on the United States as compared with those elsewhere, the extent to which there is an explicit purpose to harm or affect American commerce, the foreseeability of such effect and the relative importance to the violations charged of conduct within the United

(a) the extent to which the activity (i) takes place within the regulating state, or (ii) has substantial direct, and foreseeable effect upon or in the regulating state;

(b) the links, such as nationality, residence, or economic activity, between the regulating state and the persons principally responsible for the activity to be regulated, or between that state and those whom the law or regulation is designed to protect;

(c) the character of the activity to be regulated, the importance of regulation to the regulating state, the extent to which other states regulate such activities, and the degree to which the desirability of such regulation is generally accepted;

(d) the existence of justified expectations that might be protected or hurt by the regulation in question;

(e) the importance of regulation to the international political, legal or economic system;

(f) the extent to which such regulation is consistent with the traditions of the international system;

(g) the extent to which another state may have an interest in regulating the activity;

(h) the likelihood of conflict with regulation by other states.

(3) An exercise of jurisdiction which is not unreasonable according to the criteria indicated in Subsection (2) may nevertheless be unreasonable if it requires a person to take action that would violate a regulation of another state which is not unreasonable under

those criteria. Preference between conflicting exercises of jurisdiction is determined by evaluating the respective interests of the regulating states in light of the factors listed in Subsection (2).

(4) Under the Law of the United States:

(a) a statute, regulation or rule is to be construed as exercising jurisdiction and applying law only to the extent permissible under § 402 and this section unless such construction is not fairly possible; but

(b) where Congress has made clear its purpose to exercise jurisdiction which may be beyond the limits permitted by international law, such exercise of jurisdiction, if within the constitutional authority of Congress, is effective as law in the United States.

Section 402 of the Restatement states the following bases of jurisdiction:

Subject to § 403, a state may, under international law, exercise jurisdiction to prescribe and apply its law with respect to

(1)(a) conduct, a substantial part of which takes place within its territory;

(b) the status of persons, or interests in things, present within its territory;

(c) conduct outside its territory which has or is intended to have substantial effect within its territory;

(2) the conduct, status, interests or relations of its nationals outside its territory; or

(3) certain conduct outside its territory by persons not its nationals which is directed against the security of the state or a certain state interest.

States as compared with conduct abroad. *Timberlane, supra,* at 614.

### 2) *Application of Timberlane to Pendent Claims.*

Under *Wells Fargo,* Piaggio would have had to fulfill the *Timberlane* requirements before the court could have exercised jurisdiction over any international Lanham Act claims. Given the key role comity has assumed in limiting American overbearance in foreign affairs and in ensuring judicial reciprocity between countries, it should certainly be addressed in the context of pendent jurisdiction, just as it is now addressed in direct assertions of federal jurisdiction in antitrust and patent cases. The *Timberlane* case provides a ready-made framework for balancing the comparative interests of the various countries involved. The following is a factor by factor breakdown of the various *Timberlane* considerations:

#### 1. *The Degree of Conflict with Foreign Law or Policy*

Any finding that Bajaj has no right to the continued use of plans and specifications in question carries with it the potential for tremendous conflict with Indian policy. As evidenced by the Indian government's high level of involvement in this particular licensing arrangement, they have great interest in whether contracts which comport with their national policy of promoting industrial independence are viewed as valid in other countries. This agreement was signed under India's express approval of all terms and conditions. If the United States was given free reign to determine the contract's validity or scope, we could effectively undermine their entire policy.

#### 2. *The Principal Places of Business of the Parties*

Both Piaggio and Bajaj are foreign based corporations with their principal places of business in Italy and India respectively. Piaggio also joined its American distributing subsidiary and sued Bajaj's American distributor. This does not materially affect the outcome here as both American companies have only a tangential interest in these foreign claims.

#### 3. *The Extent to Which Enforcement can be Expected to Achieve Compliance*

An American judgment that an Indian-made, government approved contract is at least partially invalid under Indian law is unlikely to be unquestioningly enforced by Indian courts. The same reception can be expected as to any decision that the activities of an Indian corporation in India and abroad violate California state law concepts of unfair competition. Thus it seems judicially inefficient to render judgment which bears a high risk of unquestioned enforcement. On the other hand, Piaggio would encounter little difficulty enforcing an Indian court judgment against an Indian corporation.

#### 4. *The Relative Significance of Effects on the United States as Compared with Elsewhere*

The claims at issue here are exclusively those which have no effect on the United States. Given that they have no impact on the United States, the significance of effects elsewhere are *de facto* greater. Bajaj is one of India's major industrial successes. Both the manufacture and a major portion of Bajaj's sales occur in India. Likewise, Piaggio is one of Italy's larger manufacturers. Obviously the interest in this litigation is greater in these countries and in those countries into which the Bajaj vehicles are exported.

#### 5. *The Extent to Which There is the Explicit Purpose to Harm or Affect American Commerce and the Foreseeability of Such Effect*

Any argument that Bajaj intended or could have foreseen any impact on United States markets is tenuous at best. The alleged breach of the license agreement occurred fully six years before Bajaj's first scooter sale in America. To date, Bajaj has yet to sell a single three-wheeled vehicle in the United States.

No domestic company manufactures either this type of scooter or a comparable

commercial three-wheeled vehicle. Piaggio, therefore, cannot claim that there is any overseas interference with any international American sales.

### 6. *The Relative Importance to the Violations Charged of Conduct Within the United States as Compared with Conduct Abroad*

Again, the claims challenged by Bajaj's motion are only those which took place completely outside American borders. Consequently the domestic conduct is nonexistent and insignificant in comparison to the conduct abroad.

Factor after factor reveals the obvious— assertion of American jurisdiction over state and foreign law causes of action arising between two foreign corporations, surrounding overseas conduct, is wholly inappropriate in this case. The court therefore declines to assert jurisdiction over plaintiffs' breach of contract and conversion claims. The court also refuses to consider the extraterritorial aspects of Piaggio's unfair competition and unjust enrichment causes of action.

### 3) *Discretion in Pendent Jurisdiction.*

■ The court's constitutional power and congressional intent are not the only limitations on a plaintiff's ability to bring strictly non-federal causes of action in federal court. The exercise of pendent jurisdiction is purely a discretionary matter and a court may decline to exercise that power for any number of reasons.

First, allowing certain pendent claims to proceed in federal court may not always serve the very goals which justify the existence of pendent jurisdiction: judicial economy and convenience of the litigants. *United Mine Workers, supra,* at 726, 86 S.Ct. at 1139. Similarly, if it appears that the state issues predominate "whether in terms of proof, of the scope of the issue raised, or of the comprehensiveness of the remedy sought," the court may refuse to exercise jurisdiction. *Id.* Finally, a court may decline jurisdiction for "reasons independent of jurisdictional considerations" such as jury confusion. *Id.*

In this case, there are several reasons which justify the court's decision to decline jurisdiction. First, plaintiffs claim damages resulting from the sale of 800,000 vehicles world-wide. This claim obviously dwarfs the Lanham Act claim which covers the sale of less than 2,000 vehicles. While it is true that Bajaj's defense based on the validity of the license agreement requires the court to consider aspects of the overseas contract, the quantum of evidence necessary for this defense is completely overshadowed by Piaggio's massive claim for damages associated with the alleged breach of contract. In any case, the fact that a defendant raises a legitimate defense cannot, by itself, render a plaintiff's initial claim of pendency valid. The court cannot preclude the assertion of a valid defense, but it can choose not to entertain a pendent claim.

Further, any assertion that it is more convenient for the parties to litigate these claims in the Northern District of California seems improbable at best. The focus of this case is a contract dispute between two wholly foreign corporations over a contract entered into in India over a decade ago. All the evidence and witnesses remaining are most likely located in either India or Italy. Most of the discovery associated with the pendent claims will probably take place in India. Clearly, there is no compelling reason for this dispute to be litigated in this court.

Nor can it be said that there is any efficiency to be gained by allowing these non-federal claims into federal court. Even if plaintiffs obtain a favorable judgment, that judgment must still be enforced in India. In all likelihood, especially in view of the Indian Government's role in approving the contract, Indian courts will not accept an American court's judgment on the validity of a contract made under Indian law. It seems, therefore, that a suit here will only breed more litigation in other courts.

Finally, this case is likely to foster jury confusion. It is logically difficult to justify limiting a federal claim to the territorial United States while, at the same time, allowing foreign entities to sue each other for

common law breach of contract claims which occurred abroad.

For all the above reasons, the court, in its discretion, declines to exercise pendent jurisdiction in this case.

## III. FORUM NON CONVENIENS.

Defendant also raised the issue of forum non conveniens. Had the court not ruled on the jurisdictional grounds discussed above, it would have been appropriate, in light of the facts surrounding this case, to decline jurisdiction over the non-domestic claims on the condition that Bajaj waive any statute of limitations problems in a more convenient forum. Having decided the case on the basis of lack of jurisdiction, however, the court need not reach this issue.

Accordingly, IT IS HEREBY ORDERED that the Second (Breach of Contract) and Fourth (Conversion) claims of the complaint are dismissed in their entirety for lack of jurisdiction. Further, all claims for relief in the First (Lanham Act), Third (Unfair Competition), and Fifth (Unjust Enrichment) claims of the complaint based on alleged activities of defendant Bajaj Auto Limited having no effect on the interstate or foreign commerce of the United States are dismissed for lack of jurisdiction.

IT IS SO ORDERED.