**TIMBERLANE LUMBER COMPANY, et al., Plaintiffs-Appellants,**

v.

**BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION, et al., Defendants-Appellees.**

No. 83–2008.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Aug. 7, 1984.

Decided Dec. 27, 1984.

John H. Boone, Michael R. Davisson, Boone, Knudsen & Martin, P.C., San Francisco, Cal., for plaintiffs-appellants.

William I. Edlund, Pillsbury, Madison & Sutro, San Francisco, Cal., for defendants-appellees.

Before BROWNING, MERRILL, and SNEED, Circuit Judges.

SNEED, Circuit Judge:

In this antitrust action, Timberlane Lumber Company (Timberlane) alleged that Bank of America, its officers, and other individuals conspired to prevent Timberlane from milling lumber in Honduras and exporting it to the United States. The suit was consolidated with three independent tort actions brought by Timberlane employees for individual injuries suffered during the alleged illegal conduct. The district court dismissed the antitrust action under the act of state doctrine and for lack of

subject matter jurisdiction. The consolidated tort actions were dismissed under the doctrine of forum non conveniens.

This case has been before us previously. On that appeal, *Timberlane Lumber Co. v. Bank of America, N.T. & S.A.*, 549 F.2d 597 (9th Cir.1976) (*Timberlane I*), we established a tripartite test for determining the extent of federal jurisdiction in cases alleging illegal antitrust behavior abroad. We then vacated the dismissals and remanded the case for additional discovery in light of the new jurisdictional "rule of reason." After allowing additional discovery, the district court granted Bank of America's motion to dismiss the antitrust action for lack of subject matter jurisdiction. *Timberlane Lumber Co. v. Bank of America National Trust and Savings Association*, 574 F.Supp. 1453 (N.D.Cal.1983) (*Timberlane II*). The tort actions were again dismissed on forum non conveniens grounds. Timberlane appeals the dismissal in all respects. We affirm.

## I.

### FACTS AND PROCEEDINGS BELOW

The complex facts of this case are set forth in *Timberlane I*, 549 F.2d at 603–05, and *Timberlane II*, 574 F.Supp. at 1455–59. Here we will only briefly outline the facts relevant on appeal.

Timberlane, an Oregon partnership whose primary business is the purchase and distribution of lumber in the United States, formed a partnership with two Honduran corporations (Danli Industrial, S.A. and Maya Lumber Company, S. de R.L.) that were incorporated and principally owned by the general partners of Timberlane. The partnership sought to develop alternative sources of lumber for delivery to the United States from Honduras. It eventually purchased an interest in an existing but financially unstable lumber mill owned by the Lima family.

Before the Timberlane purchase, ownership of the Lima enterprise had been transferred to a group of Lima employees, Bank of America, and another competing lumber mill, Casanova. Timberlane purchased its interest from the Lima employees, who had priority over the other claims. The other two owners refused to sell their interests to Timberlane. Bank of America's actions in connection with these interests form the basis for the alleged illegal antitrust conduct.

Timberlane alleges that Bank of America refused to sell its share in the Lima enterprise because it wanted to protect its interests in other competing lumber mills by driving Timberlane out of the Honduran lumber market. Thus, Timberlane claims that Bank of America transferred its mortgage to Casanova, a Lima enterprise competitor, for no consideration other than a portion of the proceeds collected. Casanova subsequently assigned both interests to Caminals who allegedly attempted to eliminate the Lima enterprise.

Using Honduran law, Caminals tried to foreclose on the mortgages by placing an "embargo" on all property owned by the Lima enterprise. A Honduran court appointed an "intervenor" to prevent a diminution of the Timberlane assets. Timberlane alleges that through the intervenor, Caminals obtained embargos against Timberlane's partners Maya and Danli. It also claims that Bank of America paid the intervenor to use guards and troops to shut down Timberlane's milling operation. It is in this context that Timberlane's employees alleged that they were falsely arrested and imprisoned. Eventually, all of the claims relating to the mortgage foreclosure were resolved in the Honduran court system.

Timberlane filed this antitrust action seeking more than $5,000,000 in damages from Bank of America and its Honduran subsidiaries. Some of Timberlane's employees also brought individual tort actions. The district court, to repeat, dismissed (1) the antitrust action on the ground that the act of state doctrine prevented the federal courts from entertaining suit, and (2) the tort actions on the basis of forum non conveniens.

In *Timberlane I*, we vacated the district court's act of state holding and announced a tripartite test for determining the extent of federal jurisdiction over claims alleging illegal antitrust behavior abroad. Because

the case was remanded for additional discovery in light of this new "rule of reason" standard, we also vacated the forum non conveniens dismissal.

On remand, the district court allowed additional discovery. Bank of America again filed a motion to dismiss the action for lack of subject matter jurisdiction. The district court treated the motion as one filed under Federal Rule of Civil Procedure 12(b)(1) and dismissed the antitrust claim. It also again dismissed the tort claims on forum non conveniens grounds. Timberlane appeals the entirety of the district court's judgment.

## II.

## APPLICATION OF TIMBERLANE I'S JURISDICTIONAL RULE OF REASON

### A. *Dismissal Under Federal Rule of Civil Procedure 12(b)(1)*

■ Before we review the district court's application of *Timberlane I*'s jurisdictional rule of reason, we must first determine whether it was proper to dismiss the case for lack of subject matter jurisdiction under a Rule 12(b)(1) motion without affording Timberlane summary judgment treatment.

Bank of America filed a motion to dismiss the antitrust action for lack of subject matter jurisdiction, or, in the alternative, to grant summary judgment in its favor. The district court treated the motion as one filed under Rule 12(b)(1) of the Federal Rules of Civil Procedure and dismissed the

action for lack of jurisdiction. Timberlane challenges this use of Rule 12(b)(1). It says that the question of jurisdiction is so closely intertwined with the merits of the case that the district court should have afforded its motion the summary judgment treatment associated with Rule 56. We disagree.

In *Timberlane I*, 549 F.2d at 601–03, this court discussed the procedural posture of dismissals both on the basis of the act of state doctrine and for lack of subject matter jurisdiction. We said, "A motion to dismiss based on the act of state doctrine raises such a Rule 12(b)(6) objection, not a jurisdictional defect." *Id.* at 602. We acknowledged, however, that a motion to dismiss for lack of subject matter jurisdiction is properly treated as a Rule 12(b)(1) "speaking motion," and Rule 56 summary judgment treatment generally is not required. *Id.* Nonetheless, we indicated that if the district court found subject matter jurisdiction lacking because of an insufficient relation to the foreign commerce of the United States, it should have afforded the motion Rule 56 treatment. "[I]t seems settled that, when a statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiffs' substantive claim for relief, a motion to dismiss for lack of subject matter jurisdiction rather than for failure to state a claim is proper only when the allegations of the complaint are frivolous." *Id.* Timberlane relies on this language to support its contention that the district court could have dismissed the antitrust action only on a motion for summary judgment.[1] Although

1. Timberlane's argument mistakenly assumes that before the jurisdictional issue can be resolved, the district court must adjudicate the merits of its claim. Once a motion to dismiss is treated as one asking for summary judgment, it cannot be granted as long as genuine issues of material fact remain in dispute. In most cases this requires a complete trial to establish the facts on which the resolution of the merits of the case depends. This approach, however, would defeat the underlying purpose of *Timberlane I*'s "rule of reason" analysis. By reaching the merits, federal courts would violate the principles of international comity embodied in the third part of *Timberlane I*'s analysis. The test for jurisdiction would become a test of the merit of the allegations rather than the more flexi-

ble approach contemplated in *Timberlane I*. We do not believe that all cases deciding the question of extraterritorial jurisdiction should be decided under Rule 12(b)(1). But neither should district courts always reach the merits under Rule 56. The district court's articulation of a middle ground in this case is sound. One feature of this approach should be that the third part of the tripartite test should ordinarily be viewed as not involving the merits of the antitrust dispute.

Timberlane also argues that the district court failed to compel discovery concerning nonparties and impermissibly cut off all discovery efforts before completion. In light of our deferential standard of review of discovery orders,

the issue is a difficult one, we must disagree.

■ The basic principle is that Rule 56 treatment is required only when "the jurisdictional issue and the substantive issues are so intermeshed that the question of jurisdiction is dependent on decision of the merits." *Thornhill Publishing Co. v. General Telephone & Electronics Corp.*, 594 F.2d 730, 735 (9th Cir.1979). Whether this "intermesh" exists must be determined by the district judge on a case by case basis. Thus, we must determine whether in this case "the question of jurisdiction is dependent on the resolution of factual issues going to the merits." *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir.1983). *See also* 5 C. Wright & A. Miller, *Federal Practice and Procedure* § 1350, at 558 (1969).

■ *Timberlane I*'s test undertakes three separate inquiries: (1) the effect or intended effect on the foreign commerce of the United States; (2) the type and magnitude of the alleged illegal behavior; and (3) the appropriateness of exercising extraterritorial jurisdiction in light of considerations of international comity and fairness. *See Timberlane I*, 549 F.2d at 613. Had the district court dismissed the case under either of the first two parts of the test, Timberlane would occupy much stronger ground in asserting that a resolution of the merits was necessary to determine subject matter jurisdiction. A refusal to exercise jurisdiction under the third part of the test, however, need not directly implicate the merits of the case. It can involve a policy judgment that requires a consideration only of the facts as alleged. Thus, a Rule 12(b)(1) dismissal may be proper when the case is dismissed on the basis of the third part of *Timberlane I*'s jurisdictional "rule of reason." *See, e.g., Vespa of America*

*Corp. v. Bajaj Auto Ltd.*, 550 F.Supp. 224 (N.D.Cal.1982) (dismissing certain claims for lack of subject matter jurisdiction on the basis of the third part of *Timberlane I*'s analysis).

This distinction was perceived by the district court when it stated: "Since we deem the undisputed material facts show extraterritorial application of the antitrust laws inappropriate to this case, our ruling on defendants' motion for summary judgment does not reach the merits of plaintiffs' antitrust allegations." *Timberlane II*, 574 F.Supp. at 1460. To avoid the merits the district court accepted the plaintiffs' allegations as true. *See id.* at 1461 ("[W]e accept plaintiffs' allegations, as a proffer of proof in lieu of these witnesses' testimony."); *id.* at 1466 ("We take the plaintiffs' allegations of an anticompetitive effect in a relevant product market as true, as if this were a Fed.R.Civ.Pro. 12(b)(6) motion."). *See generally* Note, *Conscious Parallelism: The Business Judgment Defense in a Summary Judgment Context*, 35 Hastings L.J. 115, 119 (1983). This afforded Timberlane the benefit of any doubt that may have existed concerning the substantiality of the allegations relating to jurisdiction.[2] We hold, therefore, that the district court properly analyzed Bank of America's motion under Rule 12(b)(1).

B. *Timberlane I's "jurisdictional rule of reason."*

■ In *Timberlane I*, 549 F.2d at 615, in describing our tripartite jurisdictional test, we said that the

"problem [of extraterritorial jurisdiction] should be approached in three parts: Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States? Is it of such a type and magnitude so as to be

---

*see Rae v. Union Bank*, 725 F.2d 478, 481 (9th Cir.1984), and the district court's acceptance of proffered statements of proof, *see Timberlane II*, 574 F.Supp. at 1461, the district court's rulings regarding discovery are affirmed.

**2.** "[W]e have applied a rigorous standard of proof to defendants' claims of plaintiffs' deficiencies of evidence on the Timberlane I tripartite test, and conclude that, on the issues

material to that determination, there is neither material issue of fact to be culled from the submissions, nor is there inference or reference to such evidence favorable to plaintiffs which, even taken in the most favorable light to defeat dismissal, could support such a result."
*Timberlane II*, 574 F.Supp. at 1462 n. 24.

cognizable as a violation of the Sherman Act? As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover it?"

The district court applied *Timberlane*'s analysis and, on the basis of its third part, concluded that jurisdiction should not be exercised in this case. Although we agree with the district court's conclusion regarding each part of the *Timberlane I* test, we do not expressly approve all of its analysis. Therefore, we discuss each part of the inquiry as set forth in *Timberlane I*.[3]

1. *"Does the alleged restraint affect, or was it intended to affect, the foreign commerce of the United States?"*

The first part of *Timberlane I*'s analysis requires "that there be *some* effect—actual or intended—on American foreign commerce before the federal courts may legitimately exercise subject matter jurisdiction under [the antitrust] statutes." 549 F.2d at 613 (emphasis in original). On appeal, Bank of America does not deny that Timberlane has met this requirement. "[B]y alleging the ability and willingness to supply cognizable markets with lumber that they allege would have been competitive with that already in the marketplace, they have satisfied this prong of the Circuit's test." *Timberlane II*, 574 F.Supp. at 1466.

2. *"Is it of such a type and magnitude so as to be cognizable as a violation of the Sherman Act?"*

Under the second part of *Timberlane I*'s analysis, "a greater showing of burden or restraint may be necessary to demonstrate that the effect is sufficiently large to present a cognizable injury to the plaintiffs and, therefore, a civil *violation* of the antitrust laws." 549 F.2d at 613 (emphasis in original). Courts and commentators, however, have had difficulty identifying the nature and extent of proof required to satisfy this part of the inquiry. *See, e.g.,*

*National Bank of Canada v. Interbank Card Association,* 666 F.2d 6, 8 (2d Cir. 1981); 1 W. Fugate, *Foreign Commerce and the Antitrust Laws* § 2.15, at 89–92 (3d ed. 1982). It has been suggested that *Timberlane I* requires a showing of a "direct and substantial" effect on the foreign commerce of the United States. In fact, however, no such showing is necessary. The only issue under the second part of the inquiry is whether the magnitude of the effect identified in the first part of the test rises to the level of a civil antitrust violation, i.e., conduct that has a direct and substantial anticompetitive effect. *See Timberlane I,* 549 F.2d at 615 & n. 35. *See also Occidental Petroleum Corp. v. Buttes Gas & Oil Co.,* 331 F.Supp. 92, 102 (C.D.Cal.1971), *aff'd per curiam,* 461 F.2d 1261 (9th Cir.), *cert. denied,* 409 U.S. 950, 93 S.Ct. 272, 34 L.Ed.2d 221 (1972); Beausang, *The Extraterritorial Jurisdiction of the Sherman Act,* 70 Dick.L.Rev. 187, 191 (1966). *Timberlane I*'s requirement that the allegation state a claim under the antitrust laws, however, "is a 'practical, case-by-case economic judgment,' not one based on 'abstract or mechanistic formulae,' ... and ... the barrier raised is not very high." *Timberlane I,* 549 F.2d at 615 n. 35 (citations omitted).

In this case Timberlane alleges that Bank of America conspired with its Honduran subsidiaries to prevent Timberlane from milling lumber in Honduras and exporting it to the United States. Our review of the complaint reveals that Timberlane has alleged an injury that would state a claim under the antitrust laws against Bank of America. Thus, it satisfies the second part of the analysis.

3. *"As a matter of international comity and fairness, should the extraterritorial jurisdiction of the United States be asserted to cover it?"*

Under the third part of *Timberlane I*'s analysis, the district court must determine

---

**3.** The district court grouped *Timberlane I*'s seven factors into three categories. Because this categorization does not sufficiently clarify the application of the seven factor analysis, we believe that district courts should continue to use the factors listed in *Timberlane I*.

"whether the interests of, and links to, the United States—including the magnitude of the effect on American foreign commerce—are sufficiently strong, vis-a-vis those of other nations, to justify an assertion of extraterritorial authority." 549 F.2d at 613. This determination requires that a district court consider seven factors. The district court here found that the undisputed facts required that jurisdiction not be exercised in this case. We agree. To support our conclusion each factor will be examined.

### a. "The degree of conflict with foreign law or policy"

We must determine whether the extraterritorial enforcement of United States antitrust laws creates an actual or potential conflict with the laws and policies of other nations. Timberlane argues that no conflict exists between United States and Honduran law. We disagree. The application of United States antitrust law in this case creates a potential conflict with the Honduran government's effort to foster a particular type of business climate.

Although Honduras does not have antitrust laws as such, it does have definite policies concerning the character of its commercial climate. To promote economic development and efficiency within its relatively undeveloped economy, the Honduran Constitution and Commercial Code guarantee freedom of action. The Code specifically condemns any laws prohibiting agreements (even among competitors) to restrict or divide commercial activity. Under Honduran law, competitors may agree to allocate geographic or market territories, to restrict price or output, to cut off the source of raw materials, or to limit credit financing to obtain enterprises as long as the contracting parties are not de facto monopolists. See D. Ramirez, *A Statement of the Laws of Honduras in Matters Affecting Business* (1981). It appears that Honduran law intimately regulates private commercial activity in that country. Honduran law also promotes agreements that improve the competitive position of domestic industries in world markets by promoting efficiency and economies of scale.

On balance, we believe that the enforcement of United States antitrust laws in this case would lead to a significant conflict with Honduran law and policy. This conflict, unless outweighed by other factors in the comity analysis, is itself a sufficient reason to decline the exercise of jurisdiction over this dispute.

### b. "The nationality or allegiance of the parties and the locations of principal places of business of corporations"

Next we should consider the citizenship of the parties and witnesses involved in the alleged illegal conduct. In this case, with only one exception, all of the named parties are United States citizens or nationals. But it is also true that "[a]ll of the crucial percipient witnesses to the incidents were either Honduran citizens or residents." *Timberlane II*, 574 F.Supp. at 1470. We believe, therefore, that the citizenship of the parties weighs slightly in favor of the exercise of jurisdiction.

### c. "The extent to which enforcement by either state can be expected to achieve compliance"

The weighing of this factor yields no clear answer. Of course, any judgment against Bank of America could easily be enforced in a United States court. Whether such a judgment could be enforced as easily in Honduras is less certain. We believe that the enforcement factor tips slightly in favor of the assertion of jurisdiction in this case.

### d. "The relative significance of effects on the United States as compared with those elsewhere"

A more definitive answer emerges when we compare the effect of the alleged illegal conduct on the foreign commerce of the United States with its effect abroad. The insignificance of the effect on the foreign commerce of the United States when compared with the substantial effect in Honduras suggests federal jurisdiction should not be exercised.

A comparison of Honduran lumber imports to both United States imports and total United States lumber consumption is instructive. During the years 1970 through 1972, the amount of lumber imported from Honduras expressed as a percentage of total United States lumber imports was as follows:

| YEAR | VOLUME (BOARD FT) | VALUE ($) |
| --- | --- | --- |
| 1970 | .07% | .09% |
| 1971 | .02% | .03% |
| 1972 | .04% | .05% |

During the same years, Honduran lumber imports formed an even smaller percentage of total United States lumber consumption:

| YEAR | VOLUME (BOARD FT) |
| --- | --- |
| 1970 | .011% |
| 1971 | .004% |
| 1972 | .008% |

Clearly, Honduran imports have only a miniscule effect on United States lumber markets.

Second, a comparison of the specific submarkets of "Pine Lumber Dressed" and "Pine Lumber Rough" in no way helps Timberlane's case. Honduran imports of both "Pine Lumber" and "Pine Lumber NES Rough" expressed as a percentage of total pine lumber imports were as follows:

| YEAR | VOLUME (BOARD FT) | VALUE ($) |
| --- | --- | --- |
| 1970 | 3.0% | 4.6% |
| 1971 | 2.8% | 3.2% |
| 1972 | 3.4% | 3.5% |

Again, these figures represent only an insignificant part of the pine lumber import market. And although we do not have the relevant statistics, we believe that Honduran imports represent an insubstantial part of total United States pine lumber consumption.

The actual effect of Timberlane's potential operations on United States foreign commerce is, therefore, insubstantial, even in the narrow pine lumber market. In comparison, the effects of its activity on the considerably smaller Honduran lumber markets would have been much greater. The bank's actions also affect several other aspects of the Honduran economy such as the number of jobs, the amount of foreign exchange and taxes, and the internal competitive market. We believe that the relative significance of effects in this case weighs strongly against the exercise of jurisdiction.

e. *"The extent to which there is explicit purpose to harm or affect American commerce"*

We should also consider whether the defendant's actions were intended to harm or affect the commerce of the United States. Our review of the record reveals that Bank of America's acts were directed primarily towards securing a greater return on its investment. Its actions were consistent with Honduran customs and practices. Timberlane has not demonstrated that Bank of America had any particular interest in affecting United States commerce.

f. *"The forseeability of such effect"*

A court should also consider whether, at the time of the alleged illegal behavior, the defendant should have foreseen an effect on the foreign commerce of the United States. Aside from the fact that American commerce has not been substantially affected, Timberlane has not shown that Bank of America should have foreseen the consequences of its actions. Bank of America simply enforced its mortgage in an attempt to recoup its investment. The effects of this action were merely part of the inevitable consequences that flow from attempting to salvage something from a failing business enterprise. We do not believe that a reasonable investor would have foreseen the minimal effect that has occurred here. This weighs against the exercise of jurisdiction.

g. *"The relative importance to the violations charged of conduct within the United States as compared with conduct abroad"*

Finally, a court should consider the location of the alleged illegal conduct in order to assess the appropriateness of the exercise of extraterritorial jurisdiction. In this case both parties agree that virtually all of the illegal activity occurred in Honduras.

**1386**

This factor clearly weighs against the exercise of jurisdiction.

### h. Resolving the Seven Factor Test

It follows that all but two of the factors in *Timberlane I*'s comity analysis indicate that we should refuse to exercise jurisdiction over this antitrust case. The potential for conflict with Honduran economic policy and commercial law is great. The effect on the foreign commerce of the United States is minimal. The evidence of intent to harm American commerce is altogether lacking. The foreseeability of the anticompetitive consequences of the allegedly illegal actions is slight. Most of the conduct that must be examined occurred abroad. The factors that favor jurisdiction are the citizenship of the parties and, to a slight extent, the enforcement effectiveness of United States law. We do not believe that this is enough to justify the exercise of federal jurisdiction over this case.

### III.

### DISMISSAL OF THE CONSOLIDATED TORT CLAIMS UNDER THE DOCTRINE OF FORUM NON CONVENIENS

After dismissing the antitrust action, the district court dismissed the pendent state tort claims on the basis of forum non conveniens. *See Timberlane II,* 574 F.Supp. at 1471–72. "The witnesses, the parties, and dastardly deeds all were Honduran; these suits would clearly require us to apply Honduran law to assess liability or damages from the bank branch's activities." *Id.* at 1471 (footnote omitted). We agree.

 The doctrine of forum non conveniens allows the district court to decline to exercise its jurisdiction if, in view of all the competing considerations, the case is more appropriately tried in another forum. *See Cheng v. Boeing Co.,* 708 F.2d 1406, 1409–10 (9th Cir.), *cert. denied,* —— U.S. ——, 104 S.Ct. 549, 78 L.Ed.2d 723 (1983). A determination that jurisdiction should not be exercised is properly left to the discretion of the district court and will not be reversed unless there has been a "clear abuse of discretion." *Id.* at 1409 (quoting *Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 257, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981)). In this case, we find no abuse of discretion in the district court's application of the doctrine.

AFFIRMED.